**INTER–CONTINENTAL CORPORATION et al., Appellants,**

v.

**Robert L. MOODY, Appellee.**

**No. 14611.**

Court of Civil Appeals of Texas.

Houston.

Dec. 15, 1966.

Rehearing Denied Jan. 26, 1967.

Second Rehearing Denied Feb. 16, 1967.

580

Thompson, Coe, Cousins & Irons, Vernon Coe and Emory L. White, Jr., Dallas, for appellant Inter-Continental Corp.

F. Warren Hicks, Houston, for appellant-intervenor Martin J. Richardson.

Phipps, Smith & Alexander, Chas. B. Smith and Irwin M. Herz, Jr., Galveston, for appellee.

On Motion for Rehearing

BELL, Chief Justice.

Our original opinion handed down December 15, 1966 is withdrawn and the following is substituted as the opinion of the Court.

This is an appeal from a summary judgment in favor of appellee against appellant, Inter-Continental Corporation, granting recovery on a promissory note dated July 1, 1963 in the principal amount of $80,000.00. The note was executed in the name of Inter-Continental Corporation by its president, J. S. Shively, and attested by its secretary. The total amount of the judgment, including accrued interest and an attorney's fee, was $98,721.33. The other appellant is Martin J. Richardson, a stockholder in Inter-Continental, herein called Intervenor,

who sought to intervene in the suit to enjoin the payment of the note on the ground that the note was an ultra vires transaction because it was given in satisfaction of a personal obligation of J. S. Shively, the president of Inter-Continental. The right to intervene was asserted by virtue of Article 2.04, subd. B(1) of the Business Corporation Act, V.A.T.S. The court, on motion of appellee, struck the intervention.

Appellee's petition was in form the usual one to recover on a promissory note. He filed no pleading in response to Inter-Continental's first amended original answer.

It appears that Mr. J. S. Shively, who had been in the insurance business for many years, organized the Insurance Company of The Americas, herein called I. C. A., in 1959 or 1960. It was a Panamanian corporation with broad authority to write all forms of insurance and to invest in securities. He was the owner of all the stock except for what he refers to as qualifying shares. It never wrote any insurance policies. It did, however, shortly after its formation, begin to invest in stock of other insurance companies. The first investment was in 30% of the stock of Texas Reserve Life Insurance Company, herein called Texas Reserve, and in 51% of the stock of appellant, Inter-Continental Corporation. Appellant's single asset was 20% of the stock in Texas Reserve. While we have used round figures, these two purchases actually gave I.C.A. control over Texas Reserve because the Texas Reserve stock thus obtained amounted to slightly more than 50%. Title to the stock of Texas Reserve and of appellant was taken in the name of I.C.A.

To finance the purchase of this stock $700,000.00 came from I.C.A. and Shively personally borrowed $1,000,000.00 from the First National Bank of Dallas, herein called 1st National, and then loaned it to I.C.A. His loan to I.C.A. was secured by pledge of stock in Texas Reserve and appellant and Shively then pledged this stock and that of I.C.A. to 1st National. This trans-

action occurred in July, 1960, and the note to 1st National was due in one year.

Sometime in May, 1961, appellant, or Shively who was president of appellant, became interested in purchasing the stock of National Life Insurance Company of America, herein called N.L.A., a South Dakota corporation. It appears that several insurance organizations considered such purchase, including appellee, but decided against it. Shively talked to appellee Moody about the purchase, knowing that Moody through his investigation was familiar with the structure of N.L.A. Whether Moody brought the proposal to Shively or Shively first went to Moody to obtain the information is not made clear by the record, but Moody testifies he gave Shively the benefit of his knowledge concerning N.L.A. Just when this occurred is not clear from the record. In any event, in order to finance the purchase, insofar as a down-payment was concerned, Moody agreed to make a loan of $650,000.00 for 60 days at 5% interest. The other $150,-000.00 for the initial payment was borrowed from International Construction Associates, herein called International Associates. Too, Moody wanted, in addition, $50,000.00. Shively agreed to this. There seems some question as to whether Shively acted personally in borrowing the money and then lending it to appellant because at one point Shively testifed he did and at another point he testified he was at all times acting for appellant.

On May 31 or June 1, 1961, the Board of appellant passed a resolution. The resolution authorized Shively, as the act and deed of the corporation, to purchase from Gibraltar Life its interest in an option to purchase stock of N.L.A. that it held with some other persons. It gave Shively broad authority to work out the terms of the purchase including authority to make the down-payment and to execute any promissory notes, collateral pledges, assignments or other instruments necessary. One paragraph specifically authorized Shively as president acting for the corporation to bor-

row from himself as an individual the money necessary to make the down-payment. He was empowered to fix the interest rate and other terms of his note. Too, he was authorized to effect a purchase for appellant from Gibraltar Life of 4700 shares of stock in N.L.A. that it owned.

On June 3, 1961, appellant's Board authorized Shively as the act of the appellant corporation, I.C.A., and Shively, individually, to enter into a joint and several obligation for the purpose of borrowing $650,-000.00 from appellee Moody and to execute a 60-day non-negotiable note with 5% interest. Too, Shively was authorized to pledge the interest of appellant in the option to purchase stock in N.L.A. and the stock of N.L.A. purchased by appellant from Gibraltar. Shively was authorized to pledge the general credit of appellant to secure all indebtedness created by the above contracts and to sign all necessary instruments.

On June 5, 1961, Shively as president of appellant and individually, executed the $650,000.00 non-negotiable note to Moody and pledged as security the shares of stock of Texas Reserve and appellant held in the name of I.C.A. The note recited that the stock was held by 1st National as collateral securing an obligation of Shively for $1,-050,000.00 that was payable on or before July 19, 1961. In Shively's testimony it appears that on June 5, 1961, appellant executed its note to him for $805,000.00, though the note does not appear in the record.

In addition to the $800,000.00 cash payment made, a deferred payment on the purchase price for N.L.A. stock, amounted to $2,500,000.00. It was due with interest in two equal annual installments. We use these round figures because slightly varying amounts are used in different parts of the record.

The result of the above recital of fact is, first, that Shively individually owed 1st National $1,050,000.00 which he incurred in the purchase of stock in Texas Reserve and appellant and all of such stock and

that of I.C.A. were with 1st National as security, as were the rights of appellant in the stock of N.L.A. that was being purchased. Secondly, Moody had the note of June 5, 1961, and a second lien on the stock of appellant and Texas Reserve. Too, there was the obligation of $2,500,000.00 owed by appellant for the purchase of the stock in N.L.A. Third, Shively, either for himself or appellant, had agreed to pay Moody $50,000.00 for making the $650,-000.00 loan because of indefinitely stated services rendered by Moody when Shively became interested in the acquisition of N.L.A. There is nothing at this stage in writing showing conclusively this $50,000.00 obligation or whether it was Shively's or appellant's obligation. Nor is there anything in the corporate minutes about this $50,000.00, or authority to create it unless found in the broad language of the resolutions we have noticed. The agreement rests in the testimony of Moody and Shively and there is a conflict in the testimony as to whether such agreement was made by Shively individually or as the act of appellant.

It appears that N.L.A. had a handsome cash reserve and Shively planned to sell the Texas Reserve stock owned by I.C.A. to N.L.A. and thus be able to pay Moody and others. This he was unable to do because of adverse action by officials of South Dakota in releasing certain securities of N.L.A. The purchase of the stock in N.L.A. was actually consummated, subject to the deferred payment above stated. When the personal obligation of Shively to 1st National was due, and Moody's note was due, Shively was unable to pay. He then, according to testimony in the record from Shively and Moody, though none of the appellants' records up to this time reflect it, went to Moody to see about further financing. Moody was not interested. Shively testified he could, he thought, have refinanced the loan at 1st National but was unable to do this and pay the $650,000.00 to Moody also. Shively suggested transferring his indebtedness at 1st National and

refinancing it at the Bank of the Southwest in Houston. It was finally agreed between Shively and Moody that Shively would borrow $1,300,000.00 at the Bank of the Southwest and Moody would give said bank a "take out" letter. The effect of the letter was to obligate Moody to take over the loan if it was not paid and it also gave him the right to take it over. Moody wanted $100,000.00 for this letter. When Shively mentioned the previous $50,000.00, Moody said they would just make it one deal. None of this original $50,000.00 had been paid. This all occurred in August, 1962. At the time Shively personally owed 1st National $1,055,000.00. This amount went to that bank and the securities held by 1st National were sent to the Bank of the Southwest. Moody knew of this. Moody testified Shively explained the situation to him.

When we examine the record, it becomes very confusing as to the exact disposition of the $245,000.00 remaining of the loan. In one place it is stated $245,000.00 went to appellant. In another place it is stated that $210,000.00 went to appellant. In another place it was stated Moody was paid $650,000.00. Also it is stated that $150,000.00 went to International Associates. There just was not enough borrowed to pay all of this. Of course it is possible that the $245,000.00 passed through the hands of appellant and additional financing was obtained to pay the other obligations.

Nowhere in the record do we find a note from Shively or appellant to Moody of $100,000.00, though there is testimony that such a note was given but we are unable to determine whether it was signed by Shively, appellant or both. The first thing we find concerning action taken by appellant with specific reference to any indebtedness of it to Moody, other than the loan of $650,000.00, is the resolution passed by the Board of appellant on December 15, 1962. This was at a time when, the record shows, Shively was in danger of losing his interest in appellant and his other companies through foreclosure. He

did lose his interest in March, 1963, though he later reacquired it through other refinancing. After reacquiring his interest, Shively later lost his interest through foreclosure, though at the time of his deposition he testified he owned some stock of appellant. Shively, when all of the resolutions were passed, was a director and president of appellant and was present and voted. Too, his wholly owned company, I.C.A., owned just over 50% of appellant's stock and the balance was owned by 700 or 800 other stockholders. The December resolution recited that Shively discussed several unpaid obligations of appellant incurred when it purchased the stock of N.L.A. in 1961. It was then resolved that the Board recognized certain debts including $100,000.00 to appellee, and it was stated that the debts were incurred in financing the purchase of N.L.A. stock. The officers were authorized to execute notes to evidence the debts and the directors ratified any notes previously issued to the named creditors.

The depositions reflect that appellant's note to Moody for $100,000.00 was executed though the note is not in evidence. They also reflect that later Shively, out of his personal funds, paid $20,000.00 and the note here sued on for $80,000.00 was given by the company in renewal of the original note just mentioned.

We wish to note that from time to time Shively advanced a great amount of his personal funds to his related corporations, including appellant, though we are unable to determine the amounts that went to each. The resolution of December, 1962 recites a debt of appellant to him of $42,873.38 for expenditures and advances made by him in the operation of the appellant in addition to a note of $2,805,000.00 previously given to Shively. What this note represented we are not told, but $805,000.00 of it could be that previously alluded to where Shively testified that on June 5, 1961, appellant gave him its note for this amount, conceivably, under the record, for money he first borrowed from Moody and Inter-

national Associates and in turn he loaned to appellant.

The pleading of appellant involved on the hearing of the appellee's motion for summary judgment was its first amended original answer, in which it pled its defenses. It, in addition to a general denial, set up the following defenses:

1. That the note sued upon was given by Shively to Moody in order to get Moody to give the take out letter to the Bank of the Southwest to enable Shively to borrow $1,300,000.00 to pay the personal debt of Shively in the amount of $1,055,000.00 at the 1st National. In this connection it was alleged that the debt to 1st National was paid out of the $1,300,000.00 and the remaining $245,000.00 was used for the personal benefit of Shively or one of his wholly owned corporations and appellant received no direct benefit. It also alleged the above recited evidence about the original $50,-000.00 Shively agreed to pay Moody when the $650,000.00 was borrowed from Moody.

2. That the then officers and directors of appellant were without authority to cause the note to be issued for the payment of a benefit which did not go to appellant, but was for the sole benefit of either an officer of appellant or a corporation other than appellant, and that appellee had full knowledge of the circumstances. This in effect is a plea of ultra vires.

3. That the note was without a valid consideration being in contravention of Article 1348, Vernon's Ann.Tex.Civ.St., of which appellee was cognizant and the note was wholly void. Appellee, it is alleged, was at all material times cognizant of facts by reason of which he is deemed to have known the officers and directors were without authority to execute the note.

4. While the term "illegal" is not used, it is alleged by reason of the recited facts that the note was given for services rendered solely or in part for an officer of appellant or the benefit of another corporation of which Shively was the sole stockholder, of which appellee had notice, the note is unenforceable. It, therefore, in effect pleads illegality, it being urged it was malum in se to use corporate funds to pay the personal debt of an officer.

In reply to this answer, except in his motion for summary judgment, appellee filed no further pleading. In his motion for summary judgment appellee, among other matters not necessary to notice at this point, pled that appellants' assertion of ultra vires was as a matter of law not tenable. He then pled Article 2.04, Subd. A of the Texas Business Corporation Act. In his brief here, appellee relies on both Subdivisions A and B of said Article 2.04.

Appellant contends that Article 2.04, Subd. A, merely abolished the "limited capacity" theory relating to the power of a corporation under which theory the courts of some states hold that a corporation has no power or capacity to do an act not authorized by its charter or some statute and any act beyond the charter authority is void. Its position is that the defense of ultra vires is not completely abolished but the act only does away with the theory that everyone dealing with a corporation has constructive notice of the limits of authority contained in the charter. However, it says the usual principles of agency are applicable and the corporation may successfully assert want of authority to enter into a transaction if the other party has actual notice that the act is beyond the charter authority, or is in possession of facts that place him on inquiry as to the authority. Appellee's contention is that said Article 2.04 abolishes the defense by corporation of ultra vires.

We are of the view that it might be reasonably inferred from facts testified to that the original loan of $650,000.00 was made to Shively individually, who in turn loaned it to appellant and that Shively individually agreed to pay Moody the original $50,000.00. A contrary inference might also be made. Too, we think it may be reasonably inferred, in fact we think the

inference is compelled, that when Moody agreed to and give the "take-out" letter he knew that $1,055,000.00 was to be used to pay the personal obligation of Shively at the 1st National. He must have known that except for the $245,000.00 money must be obtained elsewhere to pay him and International Associates its $150,000.00. While there is evidence that Moody was not specifically told the money was to be used for other than appellant's benefit, the other evidence is such that he must have so known except for the possible sum of $95,000.00. We note here, however, that we are unable to tell from the record that any of the $1,300,000.00 went directly to appellant. It does appear that the refinancing effected at the Bank of the Southwest probably prevented foreclosure by 1st National. Foreclosure by 1st National would have had the effect not only of taking all of Shively's interest in all his companies we · have mentioned, but also appellant's stock owned by I.C.A. and thus there would have gone to the purchaser appellant's interest in the stock of N.L.A. Appellee urges that the latter fact shows a direct benefit to appellant. Appellee did not plead estoppel. We think an inference can be drawn that appellant received no direct benefit, certainly at least from the note sued on.

 The moving party in a motion for summary judgment has the burden of showing there is no genuine dispute as to any material issue of fact and all doubts as to the existence of such are resolved against the movant. Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.2d 929.

Having reached the conclusions above stated that there are conflicting inferences that may be drawn as to the existence of the specified ultimate facts, we must determine whether they are material as to appellant corporation in the light of the issues of law raised by appellant.

We first discuss the contention of appellant that the defense of ultra vires has not been abolished so far as the corporation is concerned.

 We overrule this contention and hold that such defense is not available to the corporation.

 Article 2.04, subd. A of Texas Business Corporation Act makes clear that the "lack of capacity" of the corporation shall not be the basis of any claim or defense in any suit at law or in equity. The "want of capacity" theory followed in some states led to the conclusion that any act beyond the charter powers was void. While actually the law in Texas, when the Texas Business Corporation Act was passed, was that such acts were voidable and not void, there were expressions in some Texas cases that such acts were void. Texas followed the general capacity theory. Hildebrand, Texas Corporations, Section 132; Brimble, Ultra Vires under The Texas Business Corporation Act, 40 Texas Law Review 677, 680. We are of the view that Subdivision A was intended to remove any vestige of the "want of capacity" theory. See Trotti, Should An Existing Corporation Adopt the Act—Panel Discussion, Proceedings, T.B.C.A. Institute, Vol. 3A, Vernon's Annotated Texas Statutes, 456, and the following case notes: Donsky, 43 Texas Law Review 792, and Patton, 43 Texas Law Review 796.

The only Texas cases we find involving a discussion of ultra vires since the adoption of the Texas Business Corporation Act are Empire Steel Corp. of Texas v. Omni Steel Corp., 378 S.W.2d 905 (CCA), ref., n. r. e., and Republic National Bank of Dallas v. Whitten, 383 S.W.2d 207 (CCA), aff'd by S.Ct. 397 S.W.2d 415. In the first cited case, which is the subject of the note in 43 Texas Law Review 792, the Court of Civil Appeals in effect held that Article 2.04, subds. A and B together effectively eliminate a plea of ultra vires by the corporation itself when it was sued. The guaranty sued on was that of a corporation made for its affiliate, the guaranty being

made before the passage of Article 1302–2.06(B), Texas Miscellaneous Corporation Law Act, which seems to now authorize such. The Court of Civil Appeals, in Whitten, which case is the subject of the note in 43 Texas Law Review 796, held, among other things, Article 2.04, subds. A and B effectively eliminated the defense of ultra vires by the corporation. This was a suit by a trustee in bankruptcy of the corporation to recover money used by the corporation to pay a debt of its president of which fact the bank had knowledge. The Supreme Court, though granting a writ of error on this and other assignments of error, affirmed on grounds of estoppel, it being shown there was a completely executed transaction from which the corporation received a direct benefit. The court expressly refrained from passing on the ultra vires problem posed by the Texas Business Corporation Act. We are in accord with the holding of the Court of Civil Appeals that the defense of ultra vires is abolished except as provided in Article 2.04, subd. B.

Subdivision B of Article 2.04 deals with the want of authority in the corporation to perform an act. It reads as follows:

"B. No act of a corporation and no conveyance or transfer of real or personal property to or by a corporation shall be invalid by reason of the fact that such act, conveyance or transfer was beyond the scope of the purpose or purposes of the corporation as expressed in its articles of incorporation or by reason of limitations on authority of its officers and directors to exercise any statutory power of the corporation, as such limitations are expressed in the articles of incorporation, but that such act, conveyance or transfer was, or is, beyond the scope of the purpose or purposes of the corporation as expressed in its articles of incorporation or inconsistent with any such expressed limitations of authority, may be asserted:

"(1) In a proceeding by a shareholder against the corporation to enjoin the doing of any act or acts or the transfer of real or personal property by or to the corporation. If the unauthorized act or transfer sought to be enjoined is being, or is to be, performed or made pursuant to any contract to which the corporation is a party, the court may, if all of the parties to the contract are parties to the proceeding and if it deems the same to be equitable, set aside and enjoin the performance of such contract, and in so doing may allow to the corporation or to the other parties to the contract, as the case may be, compensation for the loss or damage sustained by either of them which may result from the action of the court in setting aside and enjoining the performance of such contract, but anticipated profits to be derived from the performance of the contract shall not be awarded by the court as a part of loss or damage sustained.

"(2) * * *

"(3) * * *"

Paragraphs (2) and (3) are not quoted but paragraph (2) allows a suit by the corporation, or its proper representatives acting for it, against the officers or directors for exceeding their authority. Paragraph (3) allows a suit by the Attorney General to dissolve the corporation, enjoin transaction of unauthorized business or to require divestment of real property if held or acquired contrary to law.

This section deals with what may be done when an act of the corporation is beyond its charter authority or limitations on its officers and directors. The Act authorized use of want of authority to defeat performance of the act only in a suit by a shareholder and then only under the restrictions stated. It also attaches certain other consequences to acts beyond corporate authority. It allows a suit by the corporation, or authorized representative of it, or a shareholder, against the offending officers and directors. Then it author-

izes a suit by the Attorney General against the corporation.

An analysis of 2.04 will demonstrate that it affords protection to all classes really entitled to protection. Any shareholder has his remedy, if equitably entitled to relief, through a suit to enjoin performance of the particular act. The corporation or its representatives or a shareholder have their remedy by suing the officers and directors. The third party dealing with the corporation is protected to the extent that he is entitled to compensation for any loss or damage, except profits, where a shareholder is entitled to an injunction. The public is protected by the authority vested in the Attorney General, which we have noticed. The result is a broad statutory scheme dealing with acts of the corporation that are beyond its authority.

■ By giving a remedy to specified persons and not including the corporation itself, except as against the offending officer or directors, we find the legislative intent to preclude a corporation from pleading ultra vires as a defense. This construction gives relative stability to commercial transactions and at the same time protects those really entitled to protection. The act nowhere contains any intimation that only the doctrine of constructive notice is abolished. We are of the view that the defense of ultra vires by the corporation in a suit by the other party to the transaction is unavailable even though the other party had actual notice of the want of authority. See Brimble, Ultra Vires under The Texas Business Corporation Act, 677, 688–690.

The payment of an officer's debt is ultra vires but in Texas it is not illegal. Whitten, Trustee v. Republic National Bank of Dallas, 397 S.W.2d 415 (Tex.Sup.).

Other points urged by appellant corporation though not specifically discussed are overruled.

We now proceed to discuss the action of the trial court in striking the intervention

of Martin J. Richardson, the shareholder who we will refer to as intervenor.

Intervenor filed his petition in intervention against appellant corporation seeking to enjoin the payment of the note. He asserted this right to enjoin performance of the act under said Article 2.04, subd. B(1). The petition was in substance the same as the first amended original answer of appellant in that it was alleged the corporation lacked authority to execute the note which was given in payment of the personal obligation of Shively or one of his other corporations and that no direct benefit was received by appellant. He alleged knowledge of such facts by appellee. He alleged injury to himself and that Moody, if the injunction issued, would suffer no loss except anticipated profits.

Appellee moved to strike the petition in intervention and adopted by reference as grounds therefor the allegations appellee had previously made in his "Plea in Opposition to Motion for Leave to Intervene" filed by another stockholder, C. C. Carson. Carson, for reasons of health, decided not to pursue his attempt to intervene. We do not find in the record this plea of appellee. However, we take it from recitals in the court's order striking the intervention of Richardson and in statements of appellee's counsel found in the statement of facts on the hearing of the motion to strike the intervention that appellee was asserting that Richardson was really not acting for himself but for the corporation and there were no equities in his favor. By supplemental transcript appellee shows he filed a motion for summary judgment against intervenor. It was not acted on by the court, but if it had been granted, it would have been error under the record.

The court held a hearing on the motion to strike, at which testimony was given. It was shown that intervenor was the owner of 19.38 shares of stock.

Mr. Coe, the attorney representing Inter-Continental, testified on the hearing on the motion to strike the intervention. He testi-

fied that he represented Big D Development Corporation from time to time. Big D was the owner of slightly more than 50 percent of the stock of Inter-Continental. After this suit was filed by appellee, Mr. Coe was employed to represent Inter-Continental. In briefing the law Mr. Coe came to the conclusion that the individual stockholders might have some rights that were different from the corporation, though this had not been passed on by the courts. He told Mr. D. A. Childre, one of the principal stockholders and one of the officers of Big D, of this uncertainty in the law and suggested this might make it wise for Big D, a stockholder in Inter-Continental, to intervene. Mr. Childre, without stating his reasons, told Mr. Coe he had rather Big D not be an intervenor. We now quote Mr. Coe's testimony as to what Mr. Childre said to him. Mr. Childre said: "Could I not get someone to find a stockholder who would be sufficiently interested to become an intervenor?" Mr. Coe then said: "Certainly, if that is what you want to do, that is all right."

We interpret this to mean that Mr. Childre, an officer in Big D which was the majority stockholder in Inter-Continental, was going to try to get some other stockholder to intervene.

Mr. Coe then testified that Mr. Ed Barfield, who worked for the Great Southwest Life Insurance Company, or someone for him, went over a list of the stockholders. Big D also owned voting control of such insurance company. Mr. Barfield was a vice president of the insurance company but Mr. Coe was not certain as to whether he was a stockholder in Big D. Mr. Barfield knew Mr. Carson who was found to be a stockholder in Inter-Continental. Mr. Barfield went to see Mr. Carson and Mr. Carson agreed to intervene. Mr. Barfield called Mr. Coe and told him that Mr. Carson had agreed to intervene and that Mr. Barfield had agreed that Big D Development Corporation would hold Carson harmless from any expenses of the suit. Carson then called Mr. Coe and told him that he

would intervene. Mr. Coe prepared the petition to intervene and sent it to Mr. Carson.

It appears that after Mr. Carson had signed the petition and it had been sent to Mr. Hicks, the attorney for the intervenor Richardson, Mr. Carson and his doctor decided he should not, because of his health, pursue the matter further. Mr. Barfield then, without talking to Mr. Coe, obtained an agreement from Mr. Richardson to intervene. Mr. Barfield told Mr. Coe he would copy the petition in intervention that had been drawn for Mr. Carson, have Mr. Richardson sign it, and Mr. Barfield would mail it to the attorney. Mr. Barfield got Mr. Hicks' name and address from Mr. Coe.

Mr. Hicks, the attorney for Mr. Richardson, also testified in the hearing on the motion to strike. He testified he did not know and had never talked to Mr. Carson or Mr. Richardson. The petition in intervention of Mr. Carson was mailed to Mr. Hicks from Mr. Coe's office. Previous to this Mr. Coe had called Mr. Hicks by telephone and asked him if he had any engagement that would prevent his attending a hearing that had been set on either the 10th or 16th of November. This was about a week before Mr. Hicks filed the petition in intervention for Carson. At a later time Mr. Barfield personally came to Mr. Hicks' office and brought the "Plea in Intervention of Mr. Richardson, signed and sworn to * * *." The petition shows it was sworn to by Mr. Richardson before a notary public in Jefferson County. Mr. Hicks had never met Mr. Barfield before. He understood Mr. Barfield was connected with Big D.

Mr. Shively, in this hearing, testified concerning facts surrounding the execution of the note. It was in substance what we have previously stated.

The court in its order dismissing the plea found that Richardson did not take action to intervene in behalf of himself but was sought out as a minority stockholder to make the plea by Inter-Continental and the latter

made arrangements to employ Richardson's attorney. Appellee does not challenge the authority of the attorney to represent Richardson. The court also found intervenor had shown no equitable facts entitling him to intervene.

We are of the view that the court was in error in striking and dismissing the intervention.

 Article 2.04, subd. B(1) authorizes a stockholder to enjoin or set aside an act of the corporation that is ultra vires if all parties to the transaction are parties to the suit and the court deems the proceeding equitable. The statute does not expressly deal with the right to intervene. However, Rule 60, Texas Rules of Civil Procedure governs generally the right of a party to intervene. Under the rule and the doctrine of intervention existing before the passage of the rule, a party has the right to intervene if the intervenor's interest is such that if the original action had never been commenced, and he had first brought it as sole plaintiff, he would have been entitled to recover to the extent of at least a part of the relief sought; or, if the action had been brought against him he would be able to defeat recovery at least in part. His interest may be either legal or equitable. King v. Olds, 71 Tex. 729, 12 S.W. 65; Pool v. Sanford, 52 Tex. 621, 633; Mussina v. Goldthwaite, 34 Tex. 125, 126; McDonald, Texas Civil Practice, Sec. 3.47; 44 Tex.Jur.2d, Sec. 40. See also Pratt-Hewit Oil Corp. v. Hewit et al., 122 Tex. 38, 52 S.W.2d 64 (Com.App.), opinion adopted.

 We are not unaware that there is a broad discretion vested in the trial court in determining whether an intervention should be stricken. It is not, however, an unbridled one and its exercise is subject to review for abuse. If the intervenor meets the test above stated and intervention will not greatly complicate the case by the excessive multiplication of the issues, and to effectively protect the intervenor's interest intervention is almost essential, it is an abuse of discretion to strike the intervention.

 Intervenor by statute was given the right to maintain a suit against the corporation to enjoin the performance of an ultra vires act. He could, in the instant situation, have initiated the suit. While said Subdivision B(1) states the shareholder may enjoin the doing of an act in a proceeding against the corporation, it goes on to provide that the court may, if all parties to the contract are parties to the proceeding, enjoin performance if he deems it equitable and may allow damages or loss, apart from profits, to the corporation or other parties. It would seem to us that the effect of this, where the shareholder initiates the suit, is to make the other parties indispensable parties, because no effective judgment could be entered for the shareholder without the presence of all such parties. Where, as here, a shareholder states a cause of action given him by law and asserts it by way of intervention in a suit pending between the parties who must be joined if the shareholder initiates the suit, we feel his intervention should not be stricken. Rather there should be a hearing on the merits, under appropriate pleadings, which could, of course, encompass a decision of the intervenor's rights by way of a motion for summary judgment. The soundness of the above is demonstrated if we note what the result would be if the corporation is sued and judgment is rendered against it and there is a shareholder who wishes to pursue his statutory remedy. There would be a solemn judgment against the corporation and yet it and the plaintiffs in judgment would have to be sued to enjoin use of the judgment if it had not been satisfied. To say the least, there would be an awkward situation. Also, there would be the necessity of another suit. One reason interventions are favored is to avoid a multiplicity of suits. That a shareholder should be permitted to intervene in such a case as this is maintained by two Texas writers on the subject. See Brimble, Ultra Vires under The Texas Business Corporation Act, 40 Texas Law Review, 677, 693; and Trotti, Should An Existing Corporation Adopt The Act—Panel Discussion, Proceedings, Texas

Business Corporation Act Institute, 3A, Vernon's Ann.Tex.Stat., pp. 455–456.

Under the testimony of Mr. Hicks and Mr. Coe, which is all of the testimony concerning the circumstances leading to the intervention by Mr. Richardson, the reasonable conclusion to be reached is that Mr. Coe, the attorney for Inter-Continental, who in some other matters represented Big D Development Corporation and its stockholders, D. A. and Thad Childre, called Mr. D. A. Childre and gave him information about the suit against Inter-Continental and suggested that in the light of the statutes it might be wise for Big D, a stockholder, to intervene. Though Big D, for reasons unstated, preferred not to intervene, it then began efforts through Mr. Barfield to obtain another stockholder to intervene. First he obtained Mr. Carson, who was to be held free from expense of litigation by stockholder Big D. Mr. Coe was told of this and prepared the petition in intervention. The inference could be drawn that any fee to be charged would be paid by Big D, though the record shows nothing expressly in this regard. Too, it could be inferred that Mr. Coe in contacting Mr. Hicks was acting for Big D. Such conclusions are not compelled but are certainly reasonably to be inferred. Then Mr. Barfield prevailed on Mr. Richardson to intervene, had him sign the petition, and took it to Mr. Hicks. No question is raised that Mr. Hicks, counsel for intervenor, was not authorized to file the intervention for Mr. Richardson. See Rule 12, T.R.C.P.

Upon the above evidence it may well be concluded that the intervening stockholder was acting in his own interest at the urging of another stockholder, that is, Big D Development Corporation. The mere fact that a corporation representative may have given notice of the suit and suggested it might be wise for the stockholder to intervene does not make such stockholder an agent of the corporation. As a practical matter today when corporate stock is so widely held by different persons in varying and small amounts, the average stockholder can hardly be expected to keep himself informed of corporate operations except for information afforded him by corporate representatives or those associated with them. There might in some particular case be facts establishing such an agency so that in a trial on the merits he would not be entitled to the relief sought. However, whether the stockholder is in fact but the agent of the corporation is to be determined at a trial on the merits. We note that under all facts shown here no such agency is established, but they really show action by Richardson at the instigation of Big D through its representatives. We do not know what a fuller development of the facts will show. In this connection we think it material to show who is paying Mr. Hicks' attorney's fee. He may be required to disclose this though it may not be required that he show the amount.

If on trial the trier of the facts, on evidence of probative force, finds that Richardson is but the agent of Inter-Continental, then he would not be entitled to the relief sought. If intervenor is found not to be the mere agent of Inter-Continental, then he will be entitled to the relief stated below.

The court in its order striking the intervention stated there were no equitable facts or reasons entitling Richardson to intervene.

It would seem that the petition in intervention, having stated a cause of action, the question as to whether he had in fact such equities as to enable him to the relief sought is a matter to be determined in a hearing on the merits, either through a determination by a trier of the facts where material facts are in dispute, or, on motion for summary judgment where there is no genuine issue of material fact.

The question arises as to what the statute means when it states the court may enjoin the performance of the act if he deems the proceeding equitable.

 We are of the view in this case if it is determined as a fact that initially the $650,000.00 was loaned to Shively individually and Shively agreed to pay Moody $50,000.00 and then Shively loaned the money to Inter-Continental, then the court should enjoin the collection of this $50,000.00 or the unpaid portion represented in said note. If, however, as a fact the loan was directly to the appellant, the intervenor is not entitled to the relief because the obligation to pay the $50,000.00 would not be beyond the charter powers of appellant.

 As to the other $50,000.00, which together with the initial $50,000.00 was included in said note, it was incurred primarily if not wholly to refinance the personal obligation of Shively at 1st National. If a portion of the money that was obtained at the Bank of The Southwest went directly to pay an obligation of appellant, intervenor would be entitled to relief only as to a portion of the $50,000.00. That portion would be determined on a basis of the proportion that the amount used to pay an obligation of appellant bears to the total loan of $1,300,000.00. If none of the money was so used, then intervenor will be entitled to the relief sought as to the second $50,000.00.

 If relief is granted in conformity with what we have stated above, there will be no damage or loss suffered by appellee except interest. Interest would be but profits which are not allowable by Article 2.04, subd. B(1), Texas Business Corporation Act.

The whole case will be reversed and remanded, to be tried in accordance with our holding.

Appellee's motion for rehearing is overruled.

## On Second Motion for Rehearing

We reversed the judgment of the trial court against Inter-Continental in favor of appellee even though we held Inter-Continental could not successfully defend on the ground that the transaction sued on might be ultra vires. Had the rights of the corporation alone been involved appellee would have been entitled to judgment. However, we have a case where the rights of an intervening stockholder are involved. If in a trial on the merits it is determined that on the facts the stockholder is entitled to some relief, in accordance with the principles we set out in our opinion on the original motion for rehearing, appellee will be entitled to a judgment against the corporation, not for the full amount of the note, but only to the extent that the stockholder is held not to be entitled to relief. This is not because of a right in the corporation, but because of the rights of the stockholder.

Motion overruled.