**TONY'S TORTILLA FACTORY, INC., Ray Villasana, Betty Villasana, Emma Romero Villasana, Gudelia Villasana Villegas, and Henry Villasana, Appellants,**

**and**

**Mary Esther Villasana Wigley, Aurora Villasana Stanley, and Linda Villasana Zepeda, Appellants/Intervenors,**

**v.**

**FIRST BANK and Sam J. Brown, Trustee, Appellees.**

**No. 01–91–00226–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

March 25, 1993.

Rehearing Denied July 8, 1993.

Lynn E. Saarinen, Greg Laswell, Houston, Jimmie Phillips, Jr., Angelton, for appellants.

Linda J. Cole, Alvin Laser, Gregg C. Laswell, Houston, for appellees.

Before SAM BASS, MIRABAL and O'CONNOR, JJ.

## OPINION

O'CONNOR, Justice.

Can a bank's service charge for an overdraft constitute a usurious rate of interest? We hold that the issue should have been submitted to the jury. We reverse and remand the appellants' usury cause of action against the appellee, First Bank, for trial.

Was it error for the trial court to strike the plea in intervention? We hold that it was, and reverse and remand for trial all the intervenors' causes of action against the appellees, First Bank and Sam Brown.

This is an appeal from a final judgment that granted (1) a directed verdict at the conclusion of the plaintiffs' case to the defendant and appellee, First Bank, on the claims of wrongful foreclosure and usury, and to the defendant and appellee, Sam Brown, on the claims of wrongful foreclosure, deceptive trade practices act[1] violations, negligence, and gross negligence; (2) a take-nothing judgment, based on a jury verdict, to the plaintiffs on their remaining causes of action against First Bank and Brown; and (3) $60,600 in damages, plus postjudgment interest and court costs, based on a jury verdict, to First Bank under the promissory note.

The appellants, plaintiffs below, Tony's Tortilla Factory, Inc. and Emma, Ray, Bet-

---

1. Tex.Bus. & Com.Code Ann. § 17.41 (Vernon 1987)    (the DTPA).

ty, Gudelia, and Henry Villasana (the plaintiffs) attack the directed verdict on their usury cause of action against First Bank and the trial court's failure to grant a new trial based on jury misconduct. The other appellants, the intervenors, Mary Esther Villasana Wigley, Aurora Villasana Stanley, and Linda Villasana Zepeda (the intervenors), appeal from the trial court order that struck their plea in intervention.

Tony Villasana started Tony's Tortilla Factory, Inc. (the Factory) as a sole proprietorship in 1935. His wife, Emma, and children, Ray, Betty, Gudelia, Henry, Mary Esther, Aurora, and Linda at various times worked in the factory, which produced tortillas and other Mexican foods. Tony died in 1974; sometime later, the family formed a corporation. Emma owned 51 percent of the corporation; it is not clear from the record how the remaining percentage was distributed. By 1985, Emma and each of the children drew a salary from the Factory.

The Villasana family also owned a 24–acre tract of undeveloped land on Congress Avenue in Austin, Texas, near the University of Texas (the Villasana property). In 1986, Emma owned 51 percent of the land and each of the children, Ray, Betty, Mary Esther, Gudelia, Henry, Aurora, and Linda, owned seven percent.

In August 1983, the Factory secured a $380,000 loan for a five-year term from First Bank. The loan had monthly interest payments and it ballooned at the end of five years. In December 1984, this first note was renewed into another loan for $500,000, which had a floating interest rate of prime plus two. This second loan included a payoff of the first note of approximately $308,000. The second loan was due in June 1985. In August 1983, the Factory established a $60,000 revolving line of credit at First Bank. The maturity date was in August 1984, and the rate of interest on sums drawn floated at prime plus one percent. By April 1984, the entire $60,000 was drawn. The line of credit was converted to a commercial loan in August 1984. This loan was rolled into the second loan in December 1984. The combined loan was secured by deeds of trust on the Villasana property, the Factory itself, and other land in Houston. Brown was the trustee.

The Factory had two checking accounts with First Bank, an operating account and a payroll account. Beginning in April 1984 and at the time of the second loan in December 1984, these accounts were overdrawn in significant amounts: the operating account by $72,000 and the payroll account by $16,000. These amounts included some service charges. First Bank charged the Factory a $20 service charge for each insufficient funds check. First Bank waived some of these service charges, but even so, the Factory was charged over $47,000 in insufficient check charges for the period April to December 1984. The two accounts were brought to a positive balance by the December 1984 loan. From the December 1984 loan, approximately $108,000 went into the accounts of the Factory.

In June 1985, the Factory was unable to pay off the $500,000 loan, and First Bank gave it a three-month extension. The Factory was not able to pay off the loan in September 1985, but it continued to make monthly payments until January 1986. In January 1986, the bank asked the Factory to leave First Bank. Later, during negotiations from December 1987 to June 1988, the Factory made some interest payments.

In January 1986, First Bank instructed Brown to post the Villasana property for foreclosure because the December 1984 loan was in default. In April 1986, First Bank offered to lend the Factory $650,000, which the Factory refused. After several more postings, First Bank foreclosed on the Villasana property on May 21, 1987. The Factory and Emma Villasana filed bankruptcy petitions in June 1987, and the business closed in June 1989.

On February 3, 1986, the plaintiffs filed suit against First Bank and Brown. Their fourth amended petition complained that the $47,106 in service charges for checks on overdrawn accounts constituted a rate of interest for use of money in excess of the amount allowed by law and was usurious. The petition also asserted against

First Bank causes of action based on undue influence, negligence, gross negligence, and conversion, and against both First Bank and Brown causes of action based on wrongful foreclosure, violations of the DTPA, and civil conspiracy, and sought damages and injunctive and declaratory relief declaring a promissory note void and enjoining foreclosure of the Villasana property and enforcement of any of the personal guarantees. The plaintiffs attack the judgment on usury, but not on the other causes of action.

### 1. The instructed verdict

In plaintiffs' point of error one, they contend the trial court erred in granting an instructed verdict and in refusing to submit the usury cause of action to the jury.

At the close of the plaintiffs' case, First Bank moved for a directed verdict on the usury claim, asserting that there was no evidence First Bank charged interest not within legally acceptable parameters, and that as a matter of law, NSF (not sufficient funds), insufficient fund, or service charges cannot be the basis of recovery for usury. The plaintiffs responded that it was a question of fact for the jury whether the service charges were usurious. The trial court granted First Bank's motion.

In reviewing the granting of an instructed verdict by the trial court, the reviewing court will determine if there is any evidence of probative force to raise fact issues on the material questions presented. *Collora v. Navarro,* 574 S.W.2d 65, 68 (Tex.1978). The court considers all of the evidence in a light most favorable to the party against whom the verdict was instructed, and disregards all contrary evidence and inferences, and gives the losing party the benefit of all reasonable inferences arising therefrom. *Id.* Every reasonable meaning deducible from the evidence is to be indulged in the nonmovant's favor. *See Trenholm v. Ratcliff,* 646 S.W.2d 927, 931 (Tex.1983) (judgment notwithstanding the verdict). If there is any conflicting

evidence of probative value on any theory of recovery, an instructed verdict is improper, and the issue must go to the jury. *White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262 (Tex.1983); *Jones v. Tarrant Util. Co.,* 638 S.W.2d 862, 865 (Tex. 1982); *see also* TEX.R.CIV.P. 268.

In order for the usury laws to apply, there must be an overcharge by a lender for the use, forbearance, or detention of the lender's money. *Stedman v. Georgetown Sav. & Loan Ass'n,* 595 S.W.2d 486, 489 (Tex.1979). The essential elements of usury are: (1) a loan of money; (2) an absolute obligation that the principal be repaid; and (3) the exaction of a greater compensation than allowed by law for the use of the money by the borrower. *Holley v. Watts,* 629 S.W.2d 694, 696 (Tex.1982); *Bray v. McNeely,* 682 S.W.2d 615, 617 (Tex. App.—Houston [1st Dist.] 1984, no writ). Thus we have three questions: (1) Were First Bank's payments of the overdrafts loans of money? (2) Did the plaintiffs incur an absolute obligation to repay the principal? and (3) Was the compensation exacted greater than allowed by law?

### Overdrafts as loans

According to the Uniform Commercial Code (UCC), a bank may charge an otherwise properly payable item against a customer's account even though that charge creates an overdraft. TEX.BUS. & COM.CODE ANN. § 4.401 (Tex.UCC) (Vernon 1968). The Texas Supreme Court has stated that when a bank voluntarily pays a check as an overdraft, it makes a loan to its customer. *Bryan v. Citizens Nat'l Bank,* 628 S.W.2d 761, 763 n. 2 (Tex.1982); *see also Williams v. Cullen Center Bank & Trust,* 685 S.W.2d 311, 312 (Tex.1985) (section 4.401 entitles bank to treat overdraft as loan).

Other jurisdictions have similarly interpreted section 4.401 of the UCC.[2] *See United States v. Christo,* 614 F.2d 486, 493 (5th Cir.1980) (bank may enforce overdraft

---

**2.** Under the Code Construction Act, we are required to construe uniform acts included in a code to effect its general purpose to make uni-

form the law of the states that have enacted it. TEX.GOV'T CODE ANN. § 311.028 (Vernon 1988).

in the same manner as any loan); *Sayan v. Riggs Nat'l Bank,* 544 A.2d 267, 269 (D.C.App.1988) (overdraft carries agreement to repay the loan); *C & H Farm Serv. Co. v. Farmers Sav. Bank,* 449 N.W.2d 866, 876 (Io.1989) (the effect of the bank's payment of the overdraft was a loan); *Thiele v. Security State Bank,* 396 N.W.2d 295, 298 (N.D.1986) (payment of overdraft is an unsecured loan); *United States Trust Co. v. McSweeney,* 91 A.D.2d 7, 457 N.Y.S.2d 276, 278 (N.Y.S.Ct.App. 1982) (the payment of an overdraft constitutes a loan); *Pacenta v. American Sav. Bank,* 195 Ill.App.3d 808, 142 Ill.Dec. 535, 552 N.E.2d 1276, 1278 (1990) (payment of overdraft is a loan); *Brown v. Lee County Bank,* 501 So.2d 702, 703 (Fla.Ct.App.1987) (overdraft is a loan); *Schaller v. Marine Nat'l Bank of Neenah,* 131 Wis.2d 389, 388 N.W.2d 645, 648 (Ct.App.1986) (overdraft is an unsecured loan); *Dalton v. First Nat'l Bank of Grayson,* 712 S.W.2d 954, 957 (Ky.Ct.App.1986) (payment of overdraft is in the nature of a loan); *Pulaski State Bank v. Kalbe,* 122 Wis.2d 663, 364 N.W.2d 162, 163 (Ct.App.1985) (overdraft check is treated as a loan); *Chute v. Bank One of Akron,* 10 Ohio App.3d 122, 10 OBR 147, 460 N.E.2d 720, 722 (1983) (payment of overdraft is in the nature of a loan); *First Citizens Bank & Trust v. Perry,* 40 N.C.App. 272, 252 S.E.2d 288, 290 (1979) (overdraft amounts to a loan); *Continental Bank v. Fitting,* 114 Ariz. 98, 559 P.2d 218, 220 (Ct.App.1977) (overdraft carries an implied promise to reimburse); *City Bank of Honolulu v. Tenn,* 52 Haw. 51, 469 P.2d 816, 818 (1970) (an overdraft is a loan).[3] Thus, we conclude that the payment of an overdraft is a loan.

■ Even if the honoring by First Bank of the Factory's overdrawn checks did not constitute a loan as a matter of law, the testimony of James Hawley, a retired banking executive and the plaintiffs' expert witness, constituted enough evidence to go to the jury on whether First Bank's overdraft protection to the Factory constituted a loan. Hawley testified that an overdraft is, in effect, a loan for a period of time until it is covered. He said when a bank continues to pay checks where there are insufficient funds, it amounts to extending an operating line of credit to the customer.

### Obligation to repay principal

Next, we examine whether the Factory was expected to repay First Bank for the overdrawn checks the bank paid on its behalf. Rosalie Groendes, an executive vice-president and cashier for First Bank, testified that at the time the second loan of $500,000 was made, the Factory also owed First Bank for overdrafts on the Factory's operating and payroll accounts. She said that each time the Factory became overdrawn in its accounts, starting in April 1984, the bank would call the Factory, tell it what checks were insufficient, and ask if a deposit would be brought in. While Groendes could not swear that the overdrafts were covered dollar for dollar, she stated that daily deposits were made to try to cover the outstanding checks.

Ray Villasana testified on cross-examination as follows:

Q. I mean, you are not, you don't have any, no quarrel with the fact that First Bank paid your checks, do you?

A. No.

Q. And to the extent that they paid checks for amounts in excess of that you had in the bank, you don't quarrel with the fact they should be paid back, do you?

A. No.

We conclude there was evidence presented that the Factory was expected to repay First Bank for the overdrawn checks the bank paid on its behalf.

---

**3.** We note that Tex. Dep't of Banking, 7 Tex.Ad-min.Code § 12.2 (West Oct. 10, 1988) provides: "Overdrafts—Overdrafts, whether or not prearranged, are considered loans and extensions of credit for the purposes hereof. This rule does not apply to intra-day or daylight overdrafts." This rule became effective on January 8, 1986, and does not apply to the transaction in 1984 about which the Factory complains. This definition pertains to the lending limits set forth in Tex.Rev.Civ.Stat.Ann. art. 342–507 (Vernon Supp. 1993).

### Compensation greater than allowed by law

■ Finally, we address whether the charges for the overdrafts were interest charges in excess of those allowed by law. "Interest" is defined as the compensation allowed by law for the use or forbearance or detention of money. TEX.REV.CIV.STAT. ANN. art. 5069–1.01(a) (Vernon 1987).

■ Under TEX.REV.CIV.STAT.ANN. art. 5069–1.01(d) (Vernon 1987), a greater rate of interest than that fixed by law is usurious. All contracts for usury are contrary to public policy and are subject to the appropriate penalties under TEX.REV.CIV. STAT.ANN. art. 5069–1.06 (Vernon 1987). The loans covered by written agreements between First Bank and the Factory were subject to the limitations on interest set forth in TEX.REV.CIV.STAT.ANN. art. 5069–1.04 (Vernon 1987).

If there is no specified rate of interest agreed upon by the parties, TEX.REV.CIV. STAT.ANN. art. 5069–1.03 (Vernon 1987) provides that the interest rate is six percent per annum. Groendes said that no promissory notes were booked to the Factory between April 1984 and November 1984, but if payment of NSF checks when funds were not available in an account was an advance of credit, then the bank advanced credit to the Factory. According to Groendes, there was no instrument authorizing such a credit advance, except a

[s]ignature card, of course, would be the establishment of the depository relationship. That is the only agreement that I would be aware of.

■ A lender may, without violating the usury law, make an extra charge for any distinctly separate and additional consideration, other than the simple lending of the money. *Texas Commerce Bank–Arlington v. Goldring,* 665 S.W.2d 103, 104 (Tex.1984). The court looks beyond the form of the transaction to its substance to determine if the additional charge is usury. *Gonzales County Sav. & Loan Ass'n v. Freeman,* 534 S.W.2d 903, 906 (Tex.1976) (the court held a fact issue presented whether an up-front "loan fee" was legitimate commitment fee or interest). Wheth-

er a bank's fee is interest or a service charge is a question of fact for the jury. *See Goldring,* 665 S.W.2d at 104; *Dryden v. City Nat'l Bank,* 666 S.W.2d 213, 216 (Tex.App.—San Antonio 1984, writ ref'd n.r.e.) (the court of appeals found that a charge for credit life insurance, added to the interest rate, raised a fact issue whether that charge for the loan exceeded the maximum legal interest rate); *Eckols v. Sabine Bank,* 613 S.W.2d 762, 763 (Tex. App.—Beaumont 1981, writ ref'd n.r.e.) (court of appeals held it was a fact issue for jury to decide if $25 fee in connection with car loans to a car dealership was interest).

Groendes testified that the bank charged $20 per check for every insufficient check to cover the cost of reprocessing it, and discussed the reprocessing procedure in detail. She also said that check charges could be waived if there was a significant amount of money usually in the account and it was an unusual occurrence to have an insufficient check. According to Groendes, the charge could be waived by any officer of the bank, subject to that person's ability to justify his or her decision to his or her superior. Groendes testified a bank may choose to honor or not honor a check on an account that has insufficient funds, and an account was not considered overdrawn until a bank pays for a check for which an account has no funds.

Carl Graef, president of First Bank since February 1989, testified that while insufficient check charges might be unprofitable for the client, they were not necessarily unprofitable for banks. He characterized them as "fee income."

We have examined plaintiffs' exhibit one, the flow of funds through the Factory's payroll account from April 2, 1984 through February 26, 1985, and plaintiffs' exhibit two, the flow of funds through the Factory's operating account from April 2, 1984 through February 19, 1985. Those records show that, from time to time, insufficient funds checks were presented and a service charge of $20 for each overdraft was assessed, regardless of the size of the overdraft.

The smallest check for which there were insufficient funds in the payroll account was in the amount of $11.44 (July 23, 1984); the largest in the amount of $979.65 (July 18, 1984). Deposits were made to cover the overdrafts within one to eight business days. A significant number of insufficient funds checks were in amounts of less than $100, but most of the insufficient funds checks were in amounts in the $100's, $200's, and $300's.

The largest insufficient funds check drawn on the operating account was for $5,170 (September 10, 1984); the smallest for $12.68 (September 7, 1984). Deposits were usually made to cover the overdrafts within one day.

Hawley was asked to assume that the overdrafts were a method of making a loan and was questioned regarding the normal rate of interest on such a line of credit.

A. What was prime in 1984? I will answer it this way, and you will have to go back and get your own figures. I would think, on an account like this, that basically has no money with you, you would loan him at 2, 3, or 4 percent over prime on a floating basis.

\* \* \* \* \* \*

Q. Do you have any idea what the amount of interest rate charged would be on the advancement of $18.66, and charging $20 interest—?

\* \* \* \* \* \*

A. I have no calculator, but it's high.

Q. What is the highest rate of interest that your bank was allowed to charge by law when you worked for—prior to your retirement?

\* \* \* \* \* \*

A. That is a question based on—on time. The highest rate varied. At one time it was in the 20's. I believe now it's—I'm not sure, but I think it's around 18 percent as the highest rate that you can—I'm not positive of that.

Q. Do you recall in 1984 what you—?

A. I cannot recall at that time what it would be.

Q. What is the highest rates that you recall?

\* \* \* \* \* \*

A. —allowed by law is around 22, 23 percent, I think.

Hawley further testified that he understood usury to be exceeding the maximum interest rate allowed by law. In response to a hypothetical question, if $143.60 were borrowed and $20 were paid the following week, he agreed that the amount seemed to be usurious.

On this record, there is enough evidence to go to the jury on whether an absolute obligation that principal be repaid existed and whether service charges for overdraft protection constituted interest on a loan. We sustain the plaintiffs' point of error one.

### 2. Jury misconduct

In the plaintiffs' point of error two, they assert the trial court erred in failing to hold an evidentiary hearing and in failing to grant a new trial because of jury misconduct.

The trial court signed the judgment on November 27, 1990. The plaintiffs filed a timely amended motion for new trial. Among other things, the plaintiffs claimed:

That during their deliberations, the jurors considered matters which had not been introduced into evidence in answering the questions submitted to them. Such action harmed the Plaintiffs and denied them a fair consideration of the jury issues presented during the trial. That during their deliberations, the jurors considered matters which had been introduced into evidence for a limited purpose, for a reason and purpose contrary to the limiting instruction and because of such action the Plaintiffs were denied fair consideration of the jury issues presented and denied a fair trial.

Attached to the motion was an affidavit of one of the jurors, William J. Schwarzbach, one of two who did not sign the verdict. In his affidavit, he said that, during deliberations, some of the jurors discussed a lawsuit that Ray Villasana's sister had filed

against him; that some of the jurors stated Ray had been indicted for theft and would be convicted; and that they continued to discuss the subject even after he told them not to consider it.[4] Schwarzbach also stated that the discussion had an effect on the way 10 jurors answered the questions submitted to them.

Rule 327 of the Texas Rules of Civil Procedure provides:

> a. When the ground of a motion for new trial, supported by affidavit, is misconduct of the jury ... *the court shall hear evidence thereof from the jury or others in open court*, and may grant a new trial if such misconduct proved ... be material, and if it reasonably appears from the evidence both on the hearing of the motion and the trial of the case and from the record as a whole that injury probably resulted to the complaining party.

TEX.R.CIV.P. 327(a) (emphasis added).

■■■■■ If a party files a proper motion for new trial that is supported by sufficient affidavits alleging jury misconduct, the trial court must conduct a hearing. *Roy Jones Lumber Co. v. Murphy*, 139 Tex. 478, 163 S.W.2d 644, 646 (1942); TEX. R.CIV.P. 327(a); *see Texaco, Inc. v. Pennzoil Co.*, 729 S.W.2d 768, 850 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.) (sole supporting affidavit presents no evidence of juror misconduct; trial court under no duty to conduct a hearing). If, however, the party fails to request a hearing on the motion, the party waives the right to a hearing. *County of El Paso v. Boy's Concessions, Inc.*, 772 S.W.2d 291, 293 (Tex.App.—El Paso 1989, no writ); *Hernandez v. Braddock*, 641 S.W.2d 359, 362 (Tex.App.—Corpus Christi 1982, no writ).

First Bank and Brown state, and it is not controverted by the plaintiffs, that the plaintiffs did not request a hearing on their claim of jury misconduct. Nothing in the record shows a request for a hearing. Accordingly, the plaintiffs waived this point.

We overrule the plaintiffs' point of error two.

### 3. The plea in intervention

In the intervenors' point of error one, they state the trial court erred in striking their intervention sua sponte. According to their brief, they filed a plea in intervention on September 29, 1989.

The record shows the intervenors filed a number of pleas in intervention, and motions to reinstate such pleas, beginning with one filed on September 29, 1989. Neither First Bank nor Brown filed a motion to strike the September 1989 plea or some of the others. The record does not show, either by an order or in a docket entry, what ruling the trial court made on the September 1989 plea.

After the intervenors filed their third plea in intervention on June 11, 1990, First Bank and Brown filed motions to strike the plea. On August 23, 1990, by a written order, the trial court struck the intervention. This is the order presented for our review.

We overrule the intervenors' point of error one.

■■■■ In point of error two, the intervenors state the trial court abused its discretion in granting the appellees' motion to strike their intervention. They admit that factors such as the lawsuit's age (three years), delay of the lawsuit, and whether the claims of multiple parties should be joined together must be considered before striking the intervention. They argue, however, that they were indirectly part of the lawsuit by virtue of their being stockholders of the Factory and co-owners of the Villasana property; they were not impacted by the loss of the Villasana property until it was foreclosed in May 1989; and the bankruptcy filing of the Factory in June 1987 kept the case from going forward

---

**4.** During cross-examination, Ray Villasana testified that his sisters filed a lawsuit against him in 1981, alleging that he had taken $300,000 of company money for his personal use, that he had failed to file franchise tax returns for the Factory, and that he had created potential criminal liability for other family members.

until approval of the bankruptcy court in June 1989. Further, they contend that, while the case was originally set for trial on October 30, 1989, it was continued to April 2, 1990 and then to June 11, 1990, and that between April and June, First Bank had time to depose the experts proposed by the intervenors. According to the intervenors, First Bank's only opposition to the intervention was the lack of time in which to depose such experts. Finally, the intervenors assert it was an abuse of discretion to strike the intervention because they could have brought the same action in their own name.

Rule 60 of the Texas Rules of Civil Procedure provides:

> Any party may intervene by filing a pleading, subject to being stricken out by the court for sufficient cause on the motion of any party.

An intervenor is not required to secure the court's permission to intervene; the party who opposes the intervention has the burden to challenge it by a motion to strike. *Guaranty Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 657 (Tex. 1990).

■■■■ The trial court has broad discretion to determine whether to strike an intervention. We review the trial court's exercise of its discretion for abuse of discretion. *University Sav. Ass'n v. Intercontinental Consolidated Companies, Inc.*, 751 S.W.2d 657, 662 (Tex.App.—Houston [1st Dist.] 1988), *aff'd sub nom., Guaranty Fed.Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652 (Tex.1990); *Inter–Continental Corp. v. Moody*, 411 S.W.2d 578, 589 (Tex.App.—Houston [1st Dist.] 1967, writ ref'd n.r.e.). A trial court abuses its discretion when it strikes a plea in intervention without a motion to strike. *Guaranty Fed. Sav. Bank*, 793 S.W.2d at 657. It is also an abuse of discretion to strike a plea in intervention if: (1) the intervenor could have brought the same action, or any part thereof, in his own right; (2) the intervention will not complicate the case by an excessive multiplication of the issues; and (3) the intervention is almost essential to

effectively protect the intervenor's interest. *Id.*

■■■■ The intervenors are the daughters of Emma and the sisters of the remaining individual plaintiffs. They are shareholders in the Factory, and each owned seven percent of the Villasana property. Although the lawsuit was filed in February 1986, they did not file a plea in intervention until September 1989. In that plea, and in all their other pleas in intervention, they adopted all of the facts and allegations in the plaintiffs' petition and then alleged actual damages they as individuals had suffered as a proximate cause and direct result of the actions of First Bank and Brown. The intervenors also sought the same relief the plaintiffs did: the voiding of the deeds of trust and personal guarantees executed by them and the plaintiffs, the cancellation of the $500,000 note, and usury damages. They asserted no causes of action other than those originally raised by the plaintiffs.

Measuring the intervenors' plea in intervention by the standards set forth by the supreme court in *Guaranty Federal*, it is clear that the intervenors could have brought the same action in their own right, that the intervention would not have complicated the case by an excessive multiplication of the issues because the issues were the same, and that the intervention was necessary to protect the intervenors' own interest as shareholders in the Factory and part owners in the Villasana property. According to the supreme court standards, the trial court abused its discretion in denying the intervention.

It is true that the intervenors waited three years to file their intervention, while fully aware of the lawsuit. The Corpus Christi Court of Appeals has held that a trial court did not abuse its discretion in striking an intervention filed three years and nine months after suit was filed. *Armstrong v. Tidelands Life Ins. Co*, 466 S.W.2d 407, 412 (Tex.App.—Corpus Christi 1971, no writ). In *Armstrong*, the court stated: "The original parties to the litigation are entitled to be protected from the disadvantages of intervention." *Id.* at 412.

The plea in intervention in *Armstrong* was filed after Tideland's motion for summary judgment and Armstrong's reply, although before the summary judgment hearing.

Here, the first plea in intervention was filed approximately three weeks before the second trial setting of October 30, 1989. On October 17, 1989, all parties, including First Bank and Brown, moved for a continuance, stating that further discovery was necessary as a result of the intervention. The trial court denied a continuance. For reasons unconnected with any intervention, however, the trial setting date was moved to April 2, 1990, June 11, 1990, and, finally, October 15, 1990. Two more pleas in intervention were filed, well in advance of the April setting date. There would have been no disadvantage to the defendants for the intervenors to have joined the lawsuit. There was ample time to do discovery connected with the intervention. The concern expressed in *Armstrong*, therefore, does not apply to the facts in this case.

Brown argues that any error in striking the intervention was harmless because collateral estoppel precludes the relitigation of identical issues of fact or law that have been actually litigated and were essential to the judgment in a prior suit and because the statute of limitations [5] had run on the intervenors' claims by the time they filed their first intervention in September 1989. First Bank also contends any error was harmless because the statute of limitations had run on the intervenors' individual claims.

Rule 81(b)(1) of the Texas Rules of Appellate Procedure provides:

> No judgment shall be reversed on appeal and a new trial ordered in any cause on the ground that the trial court has committed an error law in the course of the trial, *unless the appellate court shall be of the opinion that the error complained of amounted to such a denial of the rights of appellant as was reasonably calculated to cause and probably did cause rendition of an improper judgment* in the case....

Appellate courts are not permitted to reverse a judgment and order a new trial unless they are of the opinion that the error of the trial court amounted to such a denial of the rights of the appellant as was reasonably calculated to and probably did cause rendition of an improper judgment. *Holmes v. J.C. Penney Co.*, 382 S.W.2d 472, 473 (Tex.1964). The harmless error rule means that, considering the trial court record as a whole, the order or the judgment of the trial court, although erroneous, resulted in no injury to the complaining party. *See Texas Power & Light Co. v. Hering*, 148 Tex. 350, 224 S.W.2d 191, 192 (1949). In invoking the harmless error rule, appellee Brown is asking us to find that, although it may have been error for the trial court to strike the intervention, it was harmless because the statute of limitations had run against the intervenors and the judgment that was rendered in favor of the plaintiffs will collaterally estop the intervenors from recovering in a new trial on the same issues. The inference is that this judgment did not harm the intervenors because they cannot hope to prevail in a future trial on the merits as a result of the unfavorable judgment to the plaintiffs.

First, a party relying on the statute of limitations has a duty to plead, prove, and secure findings sustaining the plea. *Metal Structures Corp. v. Plains Textiles, Inc.*, 470 S.W.2d 93, 99 (Tex. App.—Amarillo 1971, writ ref'd n.r.e.); Tex.R.Civ.P. 94. Although Brown affirmatively plead the statute of limitations against the intervenors, the record contains no evidence or findings to support such a plea. In the absence of proof and findings to support limitations in the trial court, and any ruling of the trial court on limitations, we will not determine that the statute of limitations prevents the causes of action asserted by the intervenors in their September 29, 1989, plea. *See Guerra v. McClellan*, 243 S.W.2d 715, 719 (Tex. App.—San Antonio 1951, no writ) (op. on reh'g) (function of court of appeals is not to pass on evidence originally and from a con-

---

**5.** Brown plead limitations as an affirmative defense, but did not assert such a bar in his

motion to strike the intervention or in his response to the intervenors' motion for new trial.

siderations of that evidence to render judgment).

■ Second, collateral estoppel is an affirmative defense that must be plead and proved. *See Jones v. Brooks*, 531 S.W.2d 221, 222–23 (Tex.App.—Texarkana 1975, writ ref'd n.r.e.); TEX.R.CIV.P. 94. For reasons similar to those discussed above on limitations, we will not determine that the jury's answers to special issues, incorporated into the trial court's judgment, collaterally estop the intervenors from asserting their causes of action.

We find the trial court abused its discretion in striking the plea of intervention, and sustain the intervenors' point of error two. We vacate the trial court's order of August 23, 1990, *striking the intervention, sever the intervenors' plea in intervention from the plaintiffs' causes of action, reverse the judgment for First Bank and Brown on all causes of action insofar as it concerns the intervenors, and remand the intervenors' causes of action for trial.

Additionally, because we sustained the plaintiffs' first point of error, which attacked only the instructed verdict in favor of First Bank on the usury cause of action, we reverse the judgment in favor of First Bank on the usury cause of action and remand that cause of action for trial.

SAM BASS, J., concurs.

SAM BASS, Justice, concurring.

I agree with the majority, in their discussion of the appellants' first point of error, that there was evidence of probative force to raise a fact issue for the jury on whether First Bank's overdraft protection to the Factory constituted a loan. There is no holding from the Texas Supreme Court that payment of an overdraft is a loan as a matter of law and, therefore, I would not so conclude, as the majority does. *See Bryan v. Citizens Nat'l Bank*, 628 S.W.2d 761, 763 n. 2 (Tex.1982); *see also Williams v. Cullen Center Bank & Trust*, 685 S.W.2d 311, 312 (Tex.1985).

I agree with the majority's discussion concerning the obligation to pay principal and compensation greater than allowed by law. Accordingly, along with the majority, I sustain the appellants' first point of error, reverse the judgment in favor of First Bank on the usury cause of action, and remand that cause of action for trial.

I agree with the discussion and holdings of the majority on the alleged jury misconduct and the plea in intervention.