**GUARANTY FEDERAL SAVINGS & LOAN ASSOCIATION, Appellant,**

v.

**The HORSESHOE OPERATING COMPANY, Appellee.**

No. 05–87–00818–CV.

Court of Appeals of Texas, Dallas.

March 23, 1988.

Rehearing Denied April 25, 1988.

Michael P. Lynn, Susan B. Greenberg, Dallas, for appellant.

Marvin Thomas, Nathan K. Griffin, Dallas, for appellee.

Before WHITHAM, ROWE and THOMAS, JJ.

WHITHAM, Justice.

Appellee, The Horseshoe Operating Company, sued appellant, Guaranty Federal Savings and Loan Association, on Guaranty's "official check." We must determine if that check is analogous to a cashier's check, which is deemed accepted when issued and is, therefore, not subject to a stop-payment order. Both parties filed motions for summary judgment. The trial court granted Horseshoe's motion and denied Guaranty's motion. We conclude that the check is analogous to a cashier's check. Hence, we treat the check as a cashier's check not subject to a stop-payment order. As to Horseshoe's attorney's fees, we conclude that there is a genuine issue of fact as to the reasonable amount of Horseshoe's attorney's fees. Accordingly, we affirm the trial court's judgment except as to the award of attorney's fees to Horseshoe. We reverse the trial court's judgment insofar as it awards attorney's fees to Horseshoe. We sever Horseshoe's cause of action for attorney's fees and remand Horseshoe's cause of action for attorney's fees to the trial court for determination of the reasonable amount of attorney's fees, if any, that Horseshoe should recover from Guaranty.

The function of a summary judgment is not to deprive a litigant of his right to a full hearing on the merits of any real issue

of fact, but to eliminate patently unmeritorious claims and untenable defenses. *Gulbenkian v. Penn,* 151 Tex. 412, 415–16, 252 S.W.2d 929, 931 (1952). The standards for reviewing a motion for summary judgment are well established. As mandated by the Supreme Court of Texas, they are as follows:

1. The movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.

2. In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true.

3. Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor.

*Nixon v. Mr. Property Management,* 690 S.W.2d 546, 548–49 (Tex.1985). It is not the purpose of the summary-judgment rule to provide either a trial by deposition or a trial by affidavit, but rather to provide a method of summarily terminating a case when it clearly appears that only a question of law is involved and that there is no genuine issue of fact. *Gaines v. Hamman,* 163 Tex. 618, 626, 358 S.W.2d 557, 563 (1962). With these principles in mind, we look to the summary-judgment proof.

On the morning of Tuesday, July 23, 1985, Donald Rubin, who was a customer of Guaranty, entered the Dallas branch of Guaranty to make a deposit. While there, Rubin told one of the employees that his associate Leo Merkow would be coming in later, with a friend, to make a large deposit. Merkow did come in later that morning, with Alan Parmet, and they brought a check, signed by Nick Zaika and drawn on the account of Royall Chevrolet & Buick Company at Citizens State Bank of Malakoff, Texas. The check, in the amount of $1,990,000.00, was payable to the order of Merkow, endorsed by him and deposited into a new account with Guaranty in the name of Parmet. About thirty minutes after Merkow and Parmet left, Parmet returned to Guaranty to obtain $900,000.00 of the funds that he had just deposited, claiming he had forgotten to do so previously.

Parmet drew a $900,000.00 check on the newly opened account, payable to Guaranty's order. Parmet also filled out an application for an "official check" of Guaranty, in that same amount, to be made payable to the order of "Binnon & Co." Guaranty did issue its check number 637571831, drawn on Citibank (New York State), N.A., for $900,000.00 payable to the order of Binnon & Co., as requested by Parmet. Parmet left the offices of Guaranty with the check.

Sometime that afternoon, Rubin spoke on the telephone with Ted Binion in Las Vegas, Nevada. Ted Binion is a part owner and the manager of the Binion's Horseshoe Casino in Las Vegas. Rubin told Ted Binion that he was bringing some other gentlemen out to Las Vegas that day and that he had a bank check in the amount of $900,000.00 which he wanted the casino to cash. Rubin gave Ted Binion the check number, the name of the remitter, and the bank name. Some hours later, David Liner, a vice president of Guaranty, received a telephone call from the Valley National Bank in Las Vegas. Liner was asked whether Guaranty had issued a $900,000.00 check, and he responded that it had not. Liner did not know of the check's issuance at that time. A few hours later, Liner received a second telephone call. This call came at about 5:30 p.m. Dallas time when the branch was being closed for the day. The call was from Ted Binion and Jack Binion in Las Vegas. Liner's testimony is that he was asked whether Guaranty had issued a $900,000.00 check, and he again said no. When told that the check had the initials E.B. on it (Guaranty had an employee named Edie Brown), Liner put the call on hold. He verified then that in fact a check had been issued and told the Binion brothers that it had. Upon inquiry, he also verified that Guaranty was in fact a financial institution and not some "back-room operation." At this time the Binions had the check since Parmet, Rubin, Merkow, and Zaika arrived at the casino just about the time Ted Binion was talking to Liner on the telephone. It is not clear whether Ted Binion made one telephone call to Guaranty, or two in quick succession; neverthe-

less, at some point Binion spoke to several Guaranty employees. Binion testified that because of the large amount of the check, he was concerned that an imposter may have been planted at Guaranty to receive his telephone call. Robert Worthen, Horseshoe's credit manager, testified he also called Guaranty. Worthen stated that on July 23, around 3:00 p.m., Las Vegas time, Worthen called Guaranty in Dallas, and talked to a woman whose initials were E.B. Worthen asked E.B. if she had issued the official check in the amount of $900,000.00, and E.B. stated that she had. E.B. further stated that she knew what she was doing when she authorized the issuance of the check and the check was "good funds." At this point we note a dispute between Liner and the Binions as to what Liner told Ted and Jack Binion about the Guaranty check. Liner's testimony is that he did not confirm or deny the validity of the check, but only confirmed that it had been issued. Ted Binion testified that at the end of the day when Liner was closing the branch and seeing that all the daily affairs were wrapped up, Liner told him that the check was "absolutely good." Liner, however, testified that he told Binion at the start of the conversation that Guaranty had not issued such a check and that at that time Binion did not tell Liner the initials E.B. were on the check.

After the telephone discussions, Horseshoe took the check from Parmet and issued $900,000.00 worth of chips to Parmet in exchange. Parmet and Rubin played blackjack at the Horseshoe casino with the chips. They lost at least $890,000.00 worth of chips in three to four hours, betting an average of $80,000.00 on each hand dealt. After losing the money, the gambling party wanted Ted Binion to get them "some girls" and to go to the Union Plaza Hotel, where they were staying. Ted Binion went with them to the hotel and told the Union Plaza to bill him, *i.e.*, Horseshoe, for their expenses. Horseshoe also reimbursed Rubin for the leasing expense of the jet aircraft that had been chartered to take the group to Las Vegas, provided them with limousine service, and gave them $5,000.00 for "some walking around money."

The next day, July 24, 1985, Worthen arrived for work at the casino about 7:00 a.m. and found a note telling him to process the Guaranty check as fast as he could. Worthen testified that he called Jack Binion to ask him what to do with the check and Jack told him to send it to the bank. Worthen also testified that he called Citibank in New York upon reading the back of the check where Worthen said it read, "if there's any questions about any checks, call this number." Worthen said he had no questions, but was "just curious," so he phoned Citibank. A Citibank employee told Worthen that Citibank had just received a stop-payment order on the check. At about the same time Worthen was arriving at work in Las Vegas, Parmet was already back in Dallas and waiting for Guaranty to open its doors for the day. When he was allowed in, he told Edie Brown and Liner that he wanted Guaranty to stop payment on the check he had purchased the day before. His reason was that the Royall Chevrolet & Buick check, with which he had opened his new account, was drawn on insufficient funds. Guaranty asked Parmet to fill out a stop-payment request form and immediately notified Citibank by telephone and in writing to stop payment on the check. Liner telephoned the Citizens State Bank in Malakoff that morning also to inquire whether the Royall Chevrolet & Buick check was in fact good. Liner was told that the check would not clear, and it eventually was returned stamped "payment stopped." Liner also received a call on July 24th from Ted Binion, at about 11:00 a.m., inquiring what had happened. Liner confirmed that payment had been stopped and told Binion why. Liner testified that as far as he knew "Binion & Company" had nothing whatsoever to do with the issuance of the check. Possessed of the check, Horseshoe demanded of Guaranty that Guaranty pay the check. Guaranty refused, and this lawsuit followed.

In its first point of error, Guaranty contends that the trial court erred in granting Horseshoe's motion for summary judgment and in denying Guaranty's motions for (1)

summary judgment, (2) rehearing and (3) new trial because Guaranty is entitled to judgment as a matter of law. Under its first point of error, Guaranty argues that the taint of gambling is illegal conduct allowing a public policy defense, that Horseshoe is not a holder in due course and that a valid stop-payment order exists. For the reasons that follow, we find no merit in any of Guaranty's arguments under its first point of error as would require us to reverse the trial court's judgment. In its second point of error, Guaranty contends, alternatively, that the trial court erred in granting Horseshoe's motion for summary judgment because Horseshoe is not entitled to judgment as a matter of law and there remain numerous genuine issues of material fact. Under its second point of error, Guaranty argues that Horseshoe failed to meet its burden of proving it is a "holder" of the check as a matter of law, that Guaranty established the personal defense of want or failure of consideration, that Horseshoe failed to meet its burden of proving that it is a holder in due course of the check as a matter of law and that there is a genuine issue of fact as to the reasonable amount of Horseshoe's attorney's fees. For the reasons that follow, we find no merit in any of Guaranty's arguments under its second point of error as would require us to reverse the trial court's judgment except as to its challenge to the award of attorney's fees to Horseshoe. We begin by addressing a primary issue; to wit, whether Guaranty could stop payment of the check.

### The "Official Check" Equivalent of a Cashier's Check

### Equivalent of Cash Question

One dispositive manner in which the parties frame the issue presents the question of whether the check is a cashier's check, or is at least analogous to a cashier's check. In commercial circles, cashier's checks have the aura of cash. *Hotel Riviera, Inc. v. First National Bank and Trust*, 768 F.2d 1201, 1204 (10th Cir.1985). A cashier's check is defined as a bill of exchange drawn by a bank upon itself and accepted in advance by the act of its issuance and not subject to countermand by either its purchaser or the issuing bank. *Wertz v. Richardson Heights Bank and Trust*, 495 S.W.2d 572, 574 (Tex.1973). As such, the bank's liability on the check is governed by the Uniform Commercial Code. Under the Code, the bank's issuance of the check, which by definition is also acceptance, constituted an agreement by the bank to honor the check as presented. *Wertz*, 495 S.W.2d at 574. The rule may thus be stated that a cashier's check is accepted for payment when issued. *Wertz*, 495 S.W.2d at 574. Horseshoe maintains that the check in the present case is the equivalent of a cashier's check and, as such, was delivered as the equivalent of cash. Guaranty insists that the "cash equivalent" theory fails. Guaranty argues that the check is not drawn by Guaranty on itself; it is drawn on Citibank, making Citibank the drawee or payor bank. TEX. BUS. & COM.CODE ANN. § 4.105(2) (Vernon 1968). Hence, Guaranty reasons that because Guaranty is not the drawee, but only the drawer, it could *never* "accept" the check within the legal meaning of that term, much less accept it in advance simply by issuing it. Guaranty asserts that under the law, *"[a]cceptance* is the *drawee's* signed engagement to honor the draft as presented." TEX.BUS. & COM.CODE ANN. § 3.410(a) (Vernon 1968) (emphasis added). Therefore, Guaranty contends that only the drawee of a check effects an acceptance, and because the Guaranty account is maintained at Citibank, no check drawn on it will ever be a cashier's check. Thus, we reach the question of whether Guaranty's check can be treated as a cashier's check although the drawer and drawee are separate financial institutions.

Our research discloses no Texas cases directly on point under the Uniform Commercial Code, nor do the parties cite us to any such cases. Authority exists, however, from our sister states, from which both parties might draw a measure of support. We limit our discussion to cases in which the person obtaining the check from a financial institution does so in circumstances indicating a wish to obtain the bank's check

in lieu of possession of cash for the purpose of transacting business of some nature. We use decisions of New Jersey courts and New York courts to illustrate differing approaches. The New Jersey courts appear to make the separate drawer and drawee distinction made by Guaranty. In *Bruno v. Collective Federal Savings and Loan Association,* 147 N.J.Super. 115, 370 A.2d 874 (App.Div.1977), a depositor withdrew an amount from her savings account in the defendant savings and loan association, not in cash, but by way of a check issued by the bank made payable to Samuel Clerico and drawn on the bank's account in the Federal Home Loan Bank. The defendant savings and loan association stopped payment. In *Bruno,* the court observed that a cashier's check is a bill of exchange, accepted for payment as soon as it is issued. A bank which issues a cashier's check cannot stop payment on it. *Bruno,* 370 A.2d at 877 n. 2. However, where the check is a "bank check," a check drawn by one bank on its account in another bank, the drawer bank on such a check has the right to issue a stop payment to the drawee bank. *Bruno,* 370 A.2d at 877 n. 2. *See also Citizens National Bank v. Fort Lee Savings & Loan Association,* 89 N.J. Super. 43, 51, 213 A.2d 315, 319–20 (Law Div.1965); *National Newark & Essex Bank v. Giordano,* 111 N.J.Super. 347, 351, 268 A.2d 327, 329 (Law Div.1970).

In New York, another result obtains. There, a bank draft bought and paid for, issued by one institution as drawer and drawn on another institution as drawee, is treated as an executed sale of credit, and not subject to recision and countermand. *See International Firearms Co. Limited v. Kingston Trust Co.,* 6 N.Y.2d 406, 189 N.Y.S.2d 911, 160 N.E.2d 656 (1959). In this firearms transaction the draft bought from Kingston Trust drawn on the Federal Reserve Bank of New York was, for the purposes of the transaction, the equivalent of money. *International Firearms,* 189 N.Y.S.2d at 914, 160 N.E.2d 658. As New York's highest court points out, if Kingston Trust chose to satisfy an erstwhile customer, that does not furnish a reason why it should not be compelled to honor its drafts.

*International Firearms,* 189 N.Y.S.2d at 915, 160 N.E.2d at 659. In *Malphrus v. Home Savings Bank,* 44 Misc.2d 705, 254 N.Y.S.2d 980 (Albany Cty.Ct.1965), Home Savings Bank was requested by its customer to issue a "teller's check" payable to Malphrus. The amount of the requested check was deducted from the customer's account. The customer delivered the check to Malphrus in part payment for an automobile. When the check was presented at the drawee bank, National Commercial Bank and Trust Company, payment was refused on the grounds that Home Savings Bank had stopped payment. The court stated that the question presented is whether or not payment on a teller's check may be stopped by the issuing bank within the purview of the Uniform Commercial Code. Noting that Home Savings Bank had no stake in the transaction whatsoever, the court held that Home Savings Bank could not stop payment on its "teller's check." The court pointed out that in this transaction the teller's check was in the nature of cash. *Malphrus,* 254 N.Y.S.2d at 982. In *Manhattan Imported Cars, Inc. v. Dime Savings Bank,* 70 Misc.2d 889, 335 N.Y.S.2d 356 (App.Term 1972), Dime Savings Bank stopped payment on its "teller's check" payable to Manhattan Imported Cars and given to the bank in payment of an automobile which was then delivered to Dime Savings Bank's depositor. Citing *International Firearms* and *Malphrus,* the court held that the teller's check was delivered as the equivalent of cash, that the teller's check was Dime Savings Bank's own direct and primary obligation to Manhattan Imported Cars and that Dime Savings Bank could not resist enforcement of its contract. *Manhattan Imported Cars,* 335 N.Y.S.2d at 357.

Thus, we reach the question whether this court should follow the approach taken in New Jersey or the approach taken in New York. In deciding the question, we remember that Guaranty chose to satisfy a customer by issuing the check. *International Firearms,* 189 N.Y.S.2d at 915, 160 N.E.2d at 659. We remember also that Guaranty had no stake in the transaction.

*Malphrus,* 254 N.Y.S.2d at 982. Further, we conclude that the check was delivered by Guaranty as the equivalent of cash. *Manhattan Imported Cars,* 335 N.Y.S.2d at 357. But we read the Uniform Commercial Code to allow a drawer bank to issue a stop payment order to a drawee bank. *See* TEX.BUS. & COM.CODE ANN. §§ 4.104(a)(5), 4.403(a) (Vernon 1968); *Bruno,* 370 A.2d at 877 n. 2.

In the present case, we conclude that the scale tips in favor of the New York approach. As noted above, the New York Court of Appeals, in a pre-Uniform Commercial Code case, held that a bank draft bought and paid for and issued by one bank as drawer and drawn on another bank as drawee is an executed sale of credit and is not subject to recision and countermand. *See International Firearms,* 189 N.Y.S.2d at 911, 160 N.E.2d at 656. Thereafter, in post-Uniform Commercial Code cases, lower courts of New York applied the *International Firearms* rationale. *See Malphrus,* 254 N.Y.S.2d at 982; *Manhattan Imported Cars,* 335 N.Y.S.2d at 357. While in Texas we have no post-Uniform Commercial Code cases directly on point, we do find the opinion of one of our Texas sister courts of appeals reaching the same pre-Uniform Commercial Code result as did the New York Court of Appeals in *International Firearms.* We refer to *American Bank of Commerce & Trust Co. v. Citizens' Guaranty State Bank,* 247 S.W. 345 (Tex.Civ. App.—Texarkana 1922, no writ). In that case, a feed store was requested "to get exchange" by a milling company in payment for a carload of feed products. The feed store obtained a draft drawn by the Lindale Bank as drawer upon the Dallas bank as drawee in favor of the milling company. As the result of a dispute not involving the banks, the Lindale bank was requested to notify the Dallas bank not to pay the draft when presented. The Dallas bank complied. The court held that the milling company could maintain suit against the Lindale bank on the draft and that the Lindale bank could not defend on the ground that the money paid it for the draft was obtained by means of fraud practiced by the milling company on third par-

ties. *American Bank of Commerce,* 247 S.W. at 346. Thus, in pre-Uniform Commercial Code Texas, a bank draft bought and paid for was an executed sale of credit and was not subject to recision and countermand.

Therefore, we reach the question of whether in post-Uniform Commercial Code Texas we will apply the *International Firearms* rationale of the New York Court of Appeals and the *American Bank of Commerce* rationale of our Texas sister court of appeals. We conclude that we should do so. Indeed, it blinks reality for the courts not to treat the "teller's check" of a savings bank in New York and an "official check" of a savings and loan association in Texas as the equivalent of cash. Too much of the personal and commercial business of this State is transacted with such checks with the expectation that they do represent cash. Certainly Guaranty considered that this "official check" was the equivalent of a cashier's check and thus was delivered as the equivalent of cash. In this connection, the record contains various evidence indicating that Guaranty treated its "official check" as analogous to a cashier's check. Liner repeatedly referred to the "official check" as a cashier's check and a bank money order. On deposition, Liner testified as follows:

> [Horseshoe's Attorney]: Would you tell the Court and the Jury just what the purpose is for an official check application?
>
> [Liner]: It's where the person comes in and gives us cash or good funds to issue a check to someone in their behalf. We use these as official checks or *money orders* instead of issuing a regular check.

(emphasis added). Further, the record contains a computer printout regarding the $900,000.00 check which specifically refers to the check as a "money order writer." The record also contains a copy of the debit/credit transfer form used by Guaranty, which bears the notation, "Stop pmt on *cashiers check.*" (emphasis added). Harold Ruyle, Guaranty's vice president in charge of security and regulations compli-

ance, testified that the official check "could probably be categorized as a cashier's check." Ruyle referred to the check as a cashier's check when asked whether he had discussed this particular check with anyone.

■■■ With respect to the reference to money orders, we point out that a *bank* money order—as is a cashier's check—is accepted for payment when issued and is not subject to countermand by either the purchaser or the issuing bank. *Bank of El Paso v. Powell,* 550 S.W.2d 383, 385 (Tex. Civ.App.—El Paso 1977, no writ). Indeed, a personal money order is analogous to a bank money order and should be treated as a cashier's check. *Interfirst Bank Carrollton v. Northpark National Bank,* 671 S.W.2d 100, 103 (Tex.App.—El Paso 1984, no writ). A personal money order is issued with unfilled blanks for the name of the payee, the date and signature of the purchaser. These things are completed at the time the purchaser negotiates the instrument. *Interfirst Bank,* 671 S.W.2d at 101. The personal money order fits the definition of a bank money order; the only difference is the name and lack of a signature. The personal money order is issued by the bank for consideration paid directly to it. It differs from a check or draft drawn on money on deposit with the bank by its customer, however, because it is not payable from a customer's account but from bank funds. It is in the nature of a sale, and once sold, no individual is concerned with the obligations it creates, only the bank. *Interfirst Bank,* 671 S.W.2d at 103–04. Furthermore, we know that Guaranty charges a fee for issuance of its "official checks" and that "stop payments" will only be accepted by Guaranty on one of two conditions. The two conditions are (1) return of the check or (2) receipt of a stop-payment order signed by all parties. We know these matters because Parmet's signed written application for the "official check" contains this language:

### IMPORTANT NOTICE

1. $2.00 CHARGE FOR EACH OFFICIAL CHECK

2. $15.00 CHARGE FOR EACH STOP PAYMENT

STOP PAYMENTS WILL ONLY BE ACCEPTED IF THE ORIGINAL CHECK IS RETURNED OR IF THE STOP PAYMENT ORDER IS SIGNED BY ALL PARTIES

Neither of the two conditions for a stop-payment order are met. The check was not returned to Guaranty for purposes of obtaining a stop-payment order, nor did Guaranty receive a stop-payment order signed by all parties. We conclude that the conditions for obtaining a stop-payment order on the check indicate that Guaranty's "official check" was the equivalent of a cashier's check and thus was delivered as the equivalent of cash.

Consequently, we conclude that Guaranty's "official check" is an executed sale of credit and is not subject to recision and countermand under the facts of the present case. Hence, we conclude further that under the facts of the present case the check is the equivalent of a cashier's check and is deemed accepted when issued and is, therefore, not subject to Guaranty's stop-payment order. It follows, and we conclude further, that Guaranty's "official check" was delivered to Parmet as the equivalent of cash.

### *Horseshoe as Holder*

Next, we consider the question of whether Horseshoe may recover on the check. For the purposes of this opinion, we assume, but do not decide, that Horseshoe is not a holder in due course. To be a holder in due course one must be a holder who takes the instrument without notice of any defense against or claim to the instrument on the part of any person. TEX.BUS. & COM.CODE ANN. § 3.302(a) (Vernon 1968). Thus, for purposes of this opinion, we assume, but do not decide, that Horseshoe accepted the check in satisfaction of a gambling debt and, therefore, is deemed to have notice of a defense to the check—the defense of illegality available in Texas. *See Gulf Collateral, Inc. v. Cauble,* 462 S.W.2d 619, 620–22 (Tex.Civ.App.—Fort Worth 1971, no writ). With the holder in

due course issue out of the way, we need only consider whether Horseshoe can nevertheless demand payment under article 3 of the Uniform Commercial Code. *See Hotel Riviera*, 768 F.2d at 1203.

Guaranty insists that Horseshoe failed to meet its burden of proving that it is a "holder" of the check as a matter of law. A holder is a person who is in possession of an instrument drawn, issued, or endorsed to him or his order or to bearer in blank. TEX.BUS. & COM.CODE ANN. § 1.201(20) (Vernon Supp.1988). Thus, when signatures are admitted or established, production of the instrument entitles a "holder" to recover on it unless the defendant establishes a defense. TEX.BUS. & COM.CODE ANN. § 3.307 (Vernon 1968).

■ It is undisputed that Horseshoe has possession of the check. Guaranty, however, maintains that the check was never endorsed to Horseshoe's order or in blank, and, therefore, the check has never been negotiated to Horseshoe. Negotiation is the transfer of an instrument in such form that the transferee becomes a holder. If the instrument is payable to order, it is negotiated by delivery with any necessary indorsement; if payable to bearer, it is negotiated by delivery. TEX.BUS. & COM. CODE ANN. § 3.202(a) (Vernon 1968). In the present case, the check is payable to the order of "Binnon & Co." We note "Binnon & Co." is an incorrect spelling. The record reflects the correct spelling to be "Binion & Co." Where an instrument is made payable to a person under a misspelled name or one other than his own, he may endorse in that name or his own or both; but his signature in both names may be required by a person paying or giving value for the instrument. TEX.BUS. & COM.CODE ANN. § 3.203 (Vernon 1968). The payee endorsed the check "Binnon & Co." Hence, we treat the check as payable to the order of "Binion & Co." It is undisputed that Horseshoe does business as Binion's Horseshoe Hotel and Casino in Las Vegas, Nevada, *a/k/a Binion & Co.* Thus, we conclude that "Binion & Co." is, indeed, Horseshoe. Binion & Co. being Horseshoe, Guaranty issued the check to

Horseshoe. Since Horseshoe's possession of the check is undisputed and the check was drawn and issued to Horseshoe, we conclude that Horseshoe is in possession of an instrument drawn and issued to Horseshoe. Indeed, in his summary judgment affidavit, Ted Binion swears that he has personal knowledge of the facts stated in the affidavit, that he is secretary-treasurer of Horseshoe which is doing business as Binion's Horseshoe Hotel and Casino in Las Vegas, Nevada, *a/k/a Binion & Co.*, and that Horseshoe is the sole owner and holder of Guaranty Federal Savings and Loan Association's official check number 637571831. Indeed, Ted Binion's affidavit introduced the check into the summary-judgment proof by sworn true copy of the check attached as exhibit "A" to his affidavit. The check introduced into the summary-judgment proof bears the indorsement "Binnion & Co." Affidavit evidence of this nature supports a summary judgment where the status of a holder is at issue. *See Jackson T. Fulgham Co. v. Stewart Title Guaranty Co.*, 649 S.W.2d 128, 130 (Tex.App.—Dallas 1983, writ ref'd). Because both the statutory definition of "holder" and the dictionary definition equate this term with "a person in possession" of a note, the recitations in Ted Binion's affidavit are sufficient to show that Horseshoe was in the "possession" of the check. *See Fulgham Co.*, 649 S.W.2d at 130–31. Since a holder is a person who is in possession of an instrument drawn and issued to him, we conclude that Horseshoe is a holder. We reason, therefore, that it is immaterial that the check has never been endorsed to or by "The Horseshoe Operating Company" or to bearer or in blank as Guaranty asserts it must.

■ Further, we reason that it is immaterial that the back of the check shows the indorsement "Binnon & Co. Jack B. Binion. Pay to order of The Horseshoe *Club* Operating Co." (emphasis added). Also, we reason that it is immaterial that beneath this indorsement appears the stamped restrictive indorsement, "Pay to the order of Valley Bank of Nevada Main Office For Deposit Only The Horseshoe *Club* Operating Co. Hotel General Account 2100322."

(emphasis added). If nothing further than the indorsement had appeared, the presumption would be, when the paper was found in the hands of the payee, that the transfer had not been completed by delivery; that it had been returned to it as its own property, or that it had been transferred only for collection, and in such cases the right of the payee, even of a negotiable instrument, to strike out the indorsement is clear. *Anderson v. Milburn Wagon Co.,* 147 S.W. 603, 604 (Tex.Civ.App.—Galveston 1912, no writ); *see Gray v. Altman,* 149 S.W. 760, 761–62 (Tex.Civ.App.—Amarillo 1912, no writ). In *Anderson,* the instrument was endorsed on the back as follows: "Pay to the order of Second National Bank, Toledo, Ohio. *Millburn Wagon Company,* Frank Hafer, Treas. Pay to the order of the bank or banker presenting this item[;] all prior indorsements guaranteed, Jan. 21, 1910. Second National Bank, Toledo, Ohio, W.C. Carr, Cashier." *Anderson,* 147 S.W. at 603 (emphasis added). The appellant alleged that this evidence affirmatively showed that Milburn Wagon Company was not the owner and holder of the note and that it had no interest therein. The court, however, held that even if an objection had been made to the introduction of the instrument because of the indorsement of transfer, Milburn Wagon would have been able to strike out the indorsement anyway, as it clearly had a right to do. *See Anderson,* 147 S.W. at 604. Even though *Anderson* and *Gray* are pre-Uniform Commercial Code cases, we conclude that this is still the applicable law under the Code. Under section 3.208, "[w]here an instrument is returned to or reacquired by a prior party he may cancel any indorsement which is not necessary to his title and reissue or further negotiate the instrument, but any intervening party is discharged as against the reacquiring party and subsequent holders not in due course and if his indorsement has been cancelled is discharged as against subsequent holders in due course as well." TEX.BUS. & COM.CODE ANN. § 3.208 (Vernon 1968). Thus, Horseshoe, as payee and reacquirer, could have chosen to keep the instrument itself or to further negotiate it. *See* § 3.208 comment.

Horseshoe chose to keep the check itself and to sue on it. Therefore, since Horseshoe could strike out subsequent indorsements and had possession of the check, we find no merit in Guaranty's argument that Horseshoe may not sue on the instrument because it has shown no relationship to Horseshoe *Club* Operating Company. Any relationship between the two companies is simply irrelevant to Horseshoe's cause of action. Therefore, we conclude that Horseshoe met its burden of proving that it is a "holder" of the check as a matter of law.

### Guaranty's Personal Defense

Thus, we reach the question of whether Horseshoe's claim as a holder can be denied because Guaranty established a personal defense. When signatures are admitted or established, production of the instrument entitles a holder to recover on it unless the defendant establishes a defense. TEX.BUS & COM.CODE ANN. § 3.307 (Vernon 1968). Horseshoe produced the instrument, and its signature (Binnon & Co.) is admitted or established. As a defense, however, Guaranty argues that it raised the defense of want or failure of consideration. Liner testified that Parmet opened a new account on July 23, 1985, by depositing a check drawn by Royall Chevrolet & Buick for $1,990.000.00. Liner further testified that Parmet purchased the check payable to "Binnon & Co." by writing a check on this account in the sum of $900,000.00 payable to Guaranty. Finally, Liner testified that the Royall Chevrolet & Buick check deposited by Parmet was returned to Guaranty marked "payment stopped," thereby causing the check drawn by Parmet to the order of Guaranty of $900,000.00 to be worthless. Guaranty relies on these facts to establish its defense of want or failure of consideration. *Hotel Riviera* addressed this issue. In *Hotel Riviera,* the bank issued its cashier's check under these circumstances. A man named Pemberton forged indorsements of two of his employer's checks ostensibly issued to two of the employer's customers. The two checks were deposited in Pemberton's account with the bank. The bank debited Pemberton's account with the amount of a

cashier's check. Pemberton used the cashier's check to gamble in Las Vegas, Nevada. There is a universal commercial reverence for cashier's checks which is the product of the issuing bank's promise of payment. *Hotel Riviera,* 786 F.2d at 1204. When a purchaser attempts to negotiate a cashier's check, however, the logical result of action by the purchaser of the cashier's check causing loss to the issuing bank fails in the case of an endorsee who has done nothing to cheat the issuing bank. *See Hotel Riviera,* 786 F.2d at 1204. In the present case, the holder, Horseshoe, did nothing to deceive the issuing bank, Guaranty. As pointed out, Liner testified that as far as he knew "Binion & Co." had nothing whatsoever to do with the issuance of the check. In short, the personal defense of failure of consideration is inapplicable. *Hotel Riviera,* 786 F.2d at 1204. In the present case, therefore, we conclude that the personal defense of want or failure of consideration is inapplicable.

### Guaranty's Public Policy Defense

■ In the present case, as in *Hotel Riviera,* a financial institution issued its check to its banking customer on the strength of a third-party check deposited in the account of its customer. In the present case, as in *Hotel Riviera,* the third-party check was worthless. In the present case, as in *Hotel Riviera,* the proceeds of the issuing bank's check were used in payment of a gambling debt. Here, as in *Hotel Riviera,* it is true that the holder accepted the check in payment of a gambling debt; yet, that acceptance was not the *cause* of the bank's injury. *See Hotel Riviera,* 768 F.2d at 1203. The worthless check deposited in Parmet's account at Guaranty used in part in payment for the official check, coupled with Guaranty's subsequent issuance of its own check without verification of the deposit, *caused* the injury. *See Hotel Riviera,* 768 F.2d at 1203. In the present case, Horseshoe had no part in prompting that injury, and its acceptance of the official check in exchange for gambling chips is irrelevant to Guaranty's loss. *See Hotel Riviera,* 768 F.2d at 1203. Therefore, since we treat Guaranty's official check as the equivalent

of a cashier's check and accepted on issuance, Guaranty cannot be allowed to escape the effect of its acceptance on the ground that the delivery of the check was nullified because it was made in payment of a gambling debt. *Hotel Riviera,* 768 F.2d at 1204.

### Disposition of Guaranty's First and Second

### Points of Error Except as To Attorney's Fees

Hence, we conclude that, in the present case, the official check of Guaranty has the aura of cash. *Hotel Riviera,* 768 F.2d at 1204. Consequently, it makes no difference whether the check was used for the purpose of gambling or for the purpose of a church donation. Since cash could be used for either purpose, then so could this check. We conclude that Horseshoe is the holder of the check and is entitled to recover on the check from the drawer of the check, Guaranty. We conclude further that there are no genuine issues of material fact as to the check and that Horseshoe is entitled to judgment as a matter of law on the check. Consequently, we conclude further that, as to the check, the trial court did not err in granting Horseshoe's motion for summary judgment and in denying Guaranty's motions for summary judgment, rehearing and new trial. We overrule Guaranty's first point of error. We overrule Guaranty's second point of error except as it pertains to the award of attorney's fees to Horseshoe.

### Attorney's Fees

■ Under its second point of error, Guaranty also challenges the award of attorney's fees to Horseshoe. Guaranty asserts that the record contains no summary-judgment proof to establish a reasonable amount of such attorney's fees. Hence, Guaranty argues that a genuine issue of material fact exists. Horseshoe fails to point to any summary-judgment proof showing a reasonable amount of attorney's fees. Instead, Horseshoe maintains that the award of attorney's fees is proper for

two reasons. First, Horseshoe asserts that counsel for Guaranty approved the summary judgment as follows: "APPROVED AS TO FORM ONLY," followed by counsel's signature. Horseshoe argues that this approval is the equivalent of a stipulation of the reasonable amount of attorney's fees. Horseshoe cites no authority. We disagree with Horseshoe's argument. We read this approval language as no more than acquiescence in the composition and organization of the particular legal document known as a summary judgment to be utilized in the present case. Indeed, by Horseshoe's reasoning, counsel's signature below "APPROVED AS TO FORM ONLY," placed there as a courtesy to bench and bar, would stipulate away any losing party's position on subsequent appeal. We decline, therefore, to treat this "approval" language and courtesy on the part of Guaranty's counsel as the equivalent of a stipulation of the reasonable amount of attorneys fees. It follows, and we so hold, that the language, "APPROVED AS TO FORM ONLY," signed by a complaining party's attorney and appearing on a judgment following the trial court's signature, is not the equivalent of a stipulation of the reasonable amount of attorney's fees awarded in the judgment.

■ The second reason advanced by Horseshoe in support of the award of attorney's fees rests on Guaranty's failure to raise the attorney's fee issue in its motion for rehearing filed April 21, 1987, and in its motion for new trial filed June 4, 1987. The trial court rendered summary judgment on May 6, 1987. Thus, we treat Guaranty's motion for new trial as the operative instrument. Horseshoe argues that since the issue of want of summary-judgment proof was not raised in the motion for new trial, Guaranty cannot raise the issue on appeal. Again, Horseshoe cites no authority. We disagree with Horseshoe's argument. We conclude that want of summary-judgment proof is not a point in a motion for new trial prerequisite to a complaint on appeal. *See* TEX.R.CIV. P. 324. We reach this conclusion because want of summary-judgment proof is not a complaint listed in Rule 324(b).

■ Instead, we apply the rule that the question on appeal is whether the summary-judgment proof establishes as a matter of law that there is no genuine issue of fact as to one or more of the essential elements of the plaintiff's cause of action. *See Gibbs v. General Motor Corp.*, 450 S.W.2d 827, 828 (Tex.1970). The reasonable amount of attorney's fees is an essential element of Horseshoe's cause of action for attorney's fees. A defendant is entitled to a summary judgment if he establishes, as a matter of law, that at least one element of plaintiff's cause of action does not exist. *Price v. Hurt*, 711 S.W.2d 84, 86 (Tex.App. —Dallas 1986, no writ). We conclude that on the record in the present case there is a genuine issue of fact as to the reasonable amount of attorneys fees. We reach this conclusion because the record contains no summary-judgment proof to establish a reasonable amount of such attorney's fees or any stipulation or agreement to establish a reasonable amount of such attorney's fees. Absent establishment of the reasonable amount of attorney's fees as an essential element of Horseshoe's cause of action for attorney's fees, we conclude that Guaranty has shown as a matter of law that there is a genuine issue of fact as to one of the essential elements of Horseshoe's cause of action for attorney's fees.

Consequently, to the extent that Guaranty's second point of error challenges the award of attorney's fees to Horseshoe, we sustain Guaranty's second point of error, sever Horseshoe's cause of action for attorney's fees and remand Horseshoe's cause of action for attorney's fees to the trial court for determination of the reasonable amount of attorney's fees, if any, that Horseshoe should recover from Guaranty.

### *Severance*

■ In its third point of error, Guaranty contends that the trial court erred in ordering severance of Horseshoe's claims against Guaranty from Horseshoe's claims against third-party defendants Rubin, Merkow, Zaika, Parmet and Royall Chevrolet & Buick because severance is prejudicial to

Guaranty under the circumstances. A trial court has broad discretion in the matter of severance of causes, and the trial court's action thereon will not be disturbed on appeal except for an abuse of discretion. *Morgan v. Compugraphic Corporation,* 675 S.W.2d 729, 734 (Tex.1984). Guaranty asserts an abuse of discretion in that severance acts to prejudice Guaranty. Guaranty grounds the alleged prejudice upon a statement made by Zaika's counsel to Guaranty's counsel that there exists evidence of Horseshoe's complicity in a scheme with the third-party defendants to defraud. Guaranty concedes that there is no such evidence of record. Guaranty maintains that the absence of such evidence is not due to any fault or lack of diligence on its part, but because of invocation of Fifth Amendment rights by the third-party defendants under criminal investigation at the time the motions for summary judgment were heard. Guaranty, however, filed no response or objection to Horseshoe's motion for severance. We conclude that if Guaranty considered severance would act to its prejudice, Guaranty should have made that fact known to the trial court before it ordered severance. Hence, we conclude that the trial court did not abuse its discretion in ordering severance when Guaranty never told the trial court that severance acts to Guaranty's prejudice. Consequently, we conclude that the trial court did not err in ordering severance of Horseshoe's claims against Guaranty from Horseshoe's claims against third-party defendants Rubin, Merkow, Zaika, Parmet and Royall Chevrolet & Buick. We overrule Guaranty's third point of error. We express no opinion on any issues that might arise between the parties to the severed claims and causes of action. We decide the present case on the record before us. The severed case must be decided on the record made upon trial of that case.

Affirmed in part and reversed, severed and remanded in part.