GUARANTY FEDERAL SAVINGS
BANK, Petitioner,

v.

The HORSESHOE OPERATING
COMPANY, Respondent.

INTERCONTINENTAL CONSOLIDAT-
ED COMPANIES, INC., Petitioner,

v.

UNIVERSITY SAVINGS ASSOCIATION
and Petrolife, Inc., Respondents.

Nos. C–7559, C–7720.

Supreme Court of Texas.

May 9, 1990.

Rehearing Overruled May 9, 1990.

Michael P. Lynn, Susan B. Greenberg, Jeffrey C. Glass, Dallas, for Guar. Federal Sav. Bank

Marvin Thomas, Nathan K. Griffin, Dallas, for Horseshoe Operating Co.

James W. Kronzer, Michael Hendryx, Houston, Dalton L. Jones, League City, for Intercontinental Consol. Companies, Inc.

James H. Leeland, W. David East, Mark K. Glasser, John E. Nelson, III, Houston, for University Sav. Ass'n and Petrolife, Inc.

ON MOTION FOR REHEARING

HIGHTOWER, Justice.

Petitioners' and Respondent The Horseshoe Operating Company's motions for rehearing are overruled. The opinion of January 3, 1990 is withdrawn and the following is substituted.

These consolidated cases concern a savings and loan association's liability on its so-called "teller's check." A "teller's check" is a check drawn by a savings association on its account at another financial institution and made payable to the person designated by the customer purchasing the check. In each case, the customer delivered the teller's check to the designated payee, but later sought to stop payment. The savings association, as drawer of the check, timely requested its drawee institution to stop payment. The payee brought suit, not against the customer who remitted the check or against the drawee that refused payment, but against the savings association. In each case, the trial court

**654**

granted summary judgment holding the savings association liable on the check. The courts of appeal, however, reached conflicting results.

In *Guaranty Federal Savings & Loan Association v. The Horseshoe Operating Co.*, the Fifth Court of Appeals affirmed, holding that such checks are equivalent to cashier's checks or cash, and therefore not subject to countermand. As a result of this analysis, the court of appeals apparently deemed irrelevant all factual issues concerning the payee's possible status as a holder in due course and the savings association's possible defenses under the Texas Business and Commerce Code. 748 S.W.2d 519. In *University Savings Association v. Intercontinental Consolidated Companies*, the First Court of Appeals rejected the "cash equivalent" analogy, and concluded that the savings association, as a "customer" of a "bank," had a statutory right to stop payment on its check, and assert its own limited defenses to payment. Insofar as the savings association's customer intervened to assert its own claim to the instrument, its claims were also available as defenses to payment. Thus, the court of appeals held that there were relevant factual issues precluding summary judgment. 751 S.W.2d 657. For the reasons explained herein, we affirm the judgment of the First Court of Appeals in *Intercontinental Consolidated Companies*. We also affirm that portion of the judgment of the Fifth Court of Appeals in *Guaranty Federal Savings & Loan Association* concerning the severance of Horseshoe's action on the check against Guaranty Federal from Guaranty Federal's third party action, and otherwise reverse the judgment and remand the cause to the trial court.

### The University Savings Case

Petrolife, Inc. (Petrolife) contracted to buy blending gasoline from Intercontinen-tal Consolidated Companies, Inc. (ICC). Allegedly as part of an ongoing fraud, ICC promised to deliver the gasoline between November 7 and 10, 1986, if it received a check for $2,008,125, half the total purchase price. Petrolife purchased a check for that amount, payable to ICC, from University Savings Association (University Savings) by borrowing on the revolving line of credit Petrolife maintained at University Savings. University Savings drew the check on one of its accounts with the Federal Home Loan Bank of Little Rock (FHLB).[1] Petrolife delivered the check to ICC, but ICC never delivered the gasoline.

On November 12, after investigating ICC's failure to deliver the gasoline and discovering its alleged fraud, Petrolife requested University Savings to stop payment. University Savings, the drawer of the check, contacted FHLB, the drawee, and requested that payment be stopped. FHLB honored the request to stop payment. Subsequently, University Savings credited Petrolife's line of credit for the amount of the check. ICC ultimately brought suit on the check, not against FHLB, but against University Savings. Petrolife filed a plea in intervention which the trial court struck.

### The Guaranty Federal Case

Alan Parmet opened an account at Guaranty Federal Savings and Loan Association (Guaranty Federal).[2] Later that day he used his new account to purchase a teller's check, referred to as an "official check" by Guaranty Federal, for $900,000. The payee on the check was designated as "Binnon & Co." Guaranty Federal drew the teller's check on its account at Citibank of New York. On the same day, Parmet cashed the check for gambling chips at "Binion's Horseshoe Casino" in Las Ve-

---

1. The Federal Home Loan Bank of Little Rock is now known as the Federal Home Loan Bank of Dallas.

2. In 1988, Guaranty Federal Savings & Loan Association was declared insolvent. Subsequently, the Federal Savings and Loan Insurance Corporation assigned certain assets and secured liabilities to Guaranty Federal Savings Bank. Among the assets and secured liabilities assigned to Guaranty Federal Savings Bank was the subject matter of this appeal. Pursuant to motion, Guaranty Federal Savings Bank was substituted as petitioner in this cause.

gas.[3] The next morning, Parmet was at Guaranty Federal when it opened, seeking to stop payment on the teller's check. Guaranty Federal immediately called Citibank to request that payment be stopped on Guaranty Federal's check. Thus, when the casino credit manager called the Citibank number listed on the teller's check, he was told that payment had been stopped. Undaunted, the casino attempted to negotiate the check. The check was endorsed "Binnon & Co. Jack B. Binion. Pay to the order of the Horseshoe Club Operating Co."; below that, it was further restrictively endorsed "Pay to the Order of Valley Bank of Nevada Main Office For Deposit Only The Horseshoe Club Operating Co. Hotel General Account 2100322." The Horseshoe Operating Company (Horseshoe) brought suit on the check, not against Parmet and his alleged co-conspirators[4], or against Citibank, but against Guaranty Federal. Guaranty Federal brought a third party claim against Parmet and his alleged co-conspirators. The trial court severed Horseshoe's action on the check against Guaranty Federal from Guaranty Federal's third party action.

### I.

The issues before this court are (1) whether a savings association which issues a teller's check may assert defenses (including its customers' defenses) to payment, (2) whether issues of material fact preclude the summary judgments, (3) whether the trial court in the University Savings case abused its discretion in striking Petrolife's plea in intervention, and (4) whether the trial court in the Guaranty Federal case abused its discretion in severing Horseshoe's action on the check from Guaranty Federal's third party action.

3. Ted Binion, the co-owner and manager of the casino, called Guaranty Federal at least once, but there is a factual dispute concerning the conversations. In any case, it is undisputed that the check was not certified or accepted in writing for purposes of the Texas Business and Commerce Code. *See* Tex.Bus. & Com.Code Ann. §§ 3.410, 3.411 (Vernon 1968).

### II.

Teller's checks have been described as "checks drawn by ... savings and loan associations on commercial banks with which they maintain checking accounts." Note, *Personal Money Orders and Teller's Checks: Mavericks under the U.C.C.*, 67 COLUM.L.REV. 524, 540 (1967). A "teller's check" is an instrument used in the savings and loan industry and is analogous to a "bank draft" in the banking industry in which a "check" is drawn by a bank on an account maintained in another bank or financial institution. *See Fulton Nat'l Bank v. Delco Corp.*, 128 Ga.App. 16, 195 S.E.2d 455 (1973).

ICC and Horseshoe argue that teller's checks are not subject to a stop payment order. As described above, a teller's check is a "check" drawn by a savings association (University Savings and Guaranty Federal) upon an account maintained in another bank or financial institution (FHLB and Citibank). The savings association is the *drawer* of the check and the other bank or financial institution is the *drawee* of the check. Neither ICC nor Horseshoe (as payees) sued the drawee that refused payment of the check.

A stop payment order is an order to the drawee not to pay the check. *See generally* Tex.Bus. & Com.Code Ann. § 4.403 (Vernon 1968). Among other things, it affects the drawee's liability to the payee. If ICC and Horseshoe sued the *drawee* because the drawee refused payment of the check on the basis of the stop payment order, the validity of the stop payment order would be germane. However, since ICC and Horseshoe sued the *drawer* of the check and *not* the drawee that refused payment, the validity of the stop payment order is beside the point.[5]

4. The third party defendants and alleged conspirators include Parmet, Donald Rubin, Leo Merkow, Nick Zaika and Royall Chevrolet & Buick Company.

5. In his concurring and dissenting opinion, Justice Mauzy agrees with the holding of the Fifth Court of Appeals in *Guaranty Federal Savings & Loan Association* —that Guaranty Federal's $900,000 "official check" was the equivalent of a

### III.

Although University Savings and Guaranty Federal stopped payment of the teller's checks, they remain liable on the checks and ICC and Horseshoe may pursue an action on the checks against them. *See First National Bank v. McKay*, 521 S.W.2d 661 (Tex.Civ.App.—Houston [1st Dist.] 1975, no writ); Tex.Bus. & Com.Code Ann. §§ 3.413, 3.802 (Vernon 1968). ICC and Horseshoe argue that University Savings and Guaranty Federal may not assert any defenses (including their customers' defenses) to payment of the teller's checks. We disagree. If ICC and Horseshoe are holders [6] and not holders in due course, they take the checks subject to all valid claims and many defenses.[7] Tex.Bus. & Com.Code Ann. § 3.306 (Vernon 1968). These include the claims and defenses of third persons who are willing to defend and intervene on behalf of the savings associations to assert their claims and defenses to the teller's checks. Tex.Bus. & Com.Code Ann. § 3.306(4) (Vernon 1968).[8] If ICC and Horseshoe are holders in due course,[9] they take the checks free from "all defenses of any party to the instrument with whom the holder has not dealt except" infancy, incapacity, duress, illegality of the transaction, fraud, discharge in insolvency, and any other discharge of which the holder has notice. Tex.Bus. & Com.Code Ann. § 3.305 (Vernon 1968). We hold that University Savings and Guaranty Federal may assert the applicable defenses to payment of the teller's checks.

Obviously, the status of ICC and Horseshoe as holders in due course determines the applicable defenses which University Savings and Guaranty Federal may assert to payment of the teller's checks. The trial courts granted motions for summary judgment in favor of ICC and Horseshoe. University Savings and Guaranty Federal argue that there are genuine issues of material fact concerning the status of ICC and Horseshoe as holders in due course which preclude the summary judgments. We agree.

The standards for reviewing a motion for summary judgment are well established.

cashier's check and not subject to countermand—because Guaranty Federal charged a two dollar "fee" for its issuance. Although banks may customarily charge a minimal fee for issuance of a cashier's check, a check is not characterized as a cashier's check based upon payment of a fee. Furthermore, Guaranty Federal's "treatment" of its "official check" as analogous to a cashier's check is immaterial.

A cashier's check is a bill of exchange drawn by a bank on itself and accepted in advance by the act of its issuance; therefore, it is not subject to countermand by its purchaser or the issuing bank. *Wertz v. Richardson Heights Bank and Trust*, 495 S.W.2d 572, 574 (Tex.1973). Since a cashier's check is accepted for payment when issued, it is not subject to a stop payment order after it has been issued. *Id.;* Tex.Bus. & Com.Code Ann. § 4.303 (Vernon Supp.1990). *Wertz* was based upon the fact that the bank was the drawer *and* the drawee of the check; thus, the issuance of the check also acted as acceptance of the check. In contrast, a teller's check is a "check" drawn by a savings association (University Savings and Guaranty Federal) upon an account maintained in another bank or financial institution (FHLB and Citibank). The savings association is the drawer of the check and the other bank or financial institution is the drawee of the check; thus, issuance of the check by the savings association on an account with another bank or financial institution does not constitute acceptance of the check.

6. A "holder" is "a person who is in possession of ... an instrument ... drawn, issued, or endorsed to him or to his order or to bearer or in blank." Tex.Bus. & Com.Code Ann. § 1.201(20) (Vernon Supp.1990).

7. These defenses include all defenses of any party which would be available in an action on a simple contract, want or failure of consideration, non-performance of any condition precedent, non-delivery, delivery for a special purpose, holder or a person through whom he holds the instrument acquired it by theft, and payment or satisfaction to such holder would be inconsistent with the terms of a restrictive endorsement. *See* Tex.Bus. & Com.Code Ann. § 3.306 (Vernon 1968).

8. "Nothing in this section [3.306] is intended to prevent the claimant from intervening in the holder's action against the obligor or defending the action for the latter, and asserting his claim in the course of such intervention or defense." Tex.Bus. & Com.Code Ann. § 3.306 comment 5 (Vernon 1968).

9. A "holder in due course" is a holder who takes the instrument (1) for value, (2) in good faith, and (3) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person. Tex.Bus. & Com.Code Ann. § 3.302 (Vernon 1968).

The movant has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *MMP, Ltd., v. Jones,* 710 S.W.2d 59 (Tex.1986). In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the nonmovant will be taken as true. *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546 (Tex.1985). Every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in its favor. *Continental Casing Corp. v. Samedan Oil Corp.,* 751 S.W.2d 499 (Tex.1988).

In response to ICC's motion for summary judgment, University Savings pleaded, among other things, that ICC was not a holder in due course and submitted affidavits raising a fact issue concerning ICC's status as a holder in due course. In response to Horseshoe's motion for summary judgment, Guaranty Federal pleaded, among other things, that Horseshoe was not a holder in due course. Guaranty Federal submitted summary judgment evidence raising a fact issue concerning Horseshoe's status as a holder in due course. Because there are issues of material fact,[10] we hold that the granting of summary judgments was error.

### IV.

Early in the case, Petrolife filed a plea in intervention setting forth certain defenses to ICC's cause of action, offering to defend University Savings and cross-filing against ICC. Without a motion to strike, the trial court struck Petrolife's plea in intervention. Petrolife and University Savings argue that the trial court abused its discretion in striking the plea in intervention. We agree.

Rule 60 of the Texas Rules of Civil Procedure provides that "[a]ny party may intervene, subject to being stricken out by the court for sufficient cause on the motion of the opposite party...." TEX.R. CIV.P. 60. An intervenor is not required to secure the court's permission to intervene; the party who opposed the intervention has the burden to challenge it by a motion to strike. *See In re Nation,* 694 S.W.2d 588 (Tex.App.—Texarkana 1985, no writ); *Jones v. Springs Ranch Co.,* 642 S.W.2d 551 (Tex.App.—Amarillo 1982, no writ). Without a motion to strike, the trial court abused its discretion in striking Petrolife's plea in intervention.

Furthermore, under Rule 60, a person or entity has the right to intervene if the intervenor could have brought the same action, or any part thereof, in his own name, or, if the action had been brought against him, he would be able to defeat recovery, or some part thereof. *Inter–Continental Corp. v. Moody,* 411 S.W.2d 578, 589 (Tex.Civ.App.—Houston [1st Dist.] 1966, writ ref'd n.r.e.); *Texas Supply Center, Inc. v. Daon Corp.,* 641 S.W.2d 335, 337 (Tex.App.—Dallas 1982, writ ref'd n.r.e). The interest asserted by the intervenor may be legal or equitable. *Moody,* 411 S.W.2d at 589. Although the trial court has broad discretion in determining whether an intervention should be stricken, it is an abuse of discretion to strike a plea in intervention if (1) the intervenor meets the above test, (2) the intervention will not complicate the case by an excessive multiplication of the issues, and (3) the intervention is almost essential to effectively protect the intervenor's interest. *Moody,* 411 S.W.2d at 589; *Daon Corp.,* 641 S.W.2d at 337.

Under the facts alleged in Petrolife's plea in intervention and counterclaim and University Savings' response to ICC's motions for partial summary judgment, Petrolife meets the above test. Furthermore, the intervention will not complicate the

10. In their responses to the motions for summary judgment, University Savings and Guaranty Federal pleaded other claims and defenses in addition to ICC and Horseshoe not being holders in due course. However, since we hold that there are issues of material fact concerning the status of ICC and Horseshoe as holders in due course, we do not address (1) whether there are issues of material fact concerning the other claims and defenses pleaded by University Savings and Guaranty Federal, or (2) the applicability or validity of the other claims and defenses pleaded by University Savings and Guaranty Federal.

case by an excessive multiplication of the issues and is almost essential to effectively protect Petrolife's interests. Judicial economy requires that Petrolife intervene and participate in the trial in order to avoid a multiplicity of lengthy lawsuits. It is undisputed that Petrolife's rights and interests will be affected by the judgment in this case. Therefore, we hold that the trial court abused its discretion in striking Petrolife's plea in intervention.

## V.

After Guaranty Federal brought a third party action against Parmet and his alleged co-conspirators, the trial court severed Horseshoe's action on the check against Guaranty Federal from Guaranty Federal's third party action. Guaranty Federal argues that the trail court abused its discretion in granting the severance. We disagree.

Rule 41 of the Texas Rules of Civil Procedure provides that "[a]ny claim against a party may be severed and proceeded with separately." This rule grants the trial court broad discretion in the matter of severance and consolidation of causes. *McGuire v. Commercial Union Ins. Co.,* 431 S.W.2d 347 (Tex.1968). The trial court's decision to grant a severance will not be reversed unless it has abused its discretion. *Saxer v. Nash Phillips–Copus Co. Real Estate,* 678 S.W.2d 736 (Tex.App. —Tyler 1984, writ ref'd n.r.e.). A claim is properly severable if (1) the controversy involves more than one cause of action, (2) the severed claim is one that would be the proper subject of a lawsuit if independently asserted, and (3) the severed claim is not so interwoven with the remaining action that they involve the same facts and issues. *Id.; Weaver v. Jock,* 717 S.W.2d 654 (Tex. App.—Waco 1986, writ ref'd n.r.e.). The

controlling reasons for a severance are to do justice, avoid prejudice and further convenience. *St. Paul Ins. Co. v. McPeak,* 641 S.W.2d 284 (Tex.App.—Houston [1st Dist] 1982, writ ref'd n.r.e.).

Horseshoe's action against Guaranty Federal was based upon wrongful dishonor of an official check and debt. Guaranty Federal did not file a counterclaim against Horseshoe. Guaranty Federal's third party action asserted (1) that Parmet and his alleged co-conspirators engaged in a plot and scheme to defraud Guaranty Federal and (2) that Guaranty Federal was a holder or holder in due course with respect to the check from Royall Chevrolet & Buick Company and demanded payment on the check from Parmet, Leo Merkow and Royall Chevrolet & Buick Company. Horseshoe's action on the check against Guaranty Federal was severed from Guaranty Federal's third party action.

As described above, the "controversy" involved more than one cause of action: Horseshoe's actions for wrongful dishonor and debt and Guaranty Federal's actions for conspiracy to defraud and payment of the original check from Royall Chevrolet & Buick Company. The severed claim, Horseshoe's action for wrongful dishonor and debt against Guaranty Federal, is the proper subject of an independently asserted lawsuit. Further, Horseshoe's action for wrongful dishonor and debt against Guaranty Federal, is *not* so interwoven with Guaranty Federal's third party action that they involve the same facts and issues. Horseshoe's action concerns wrongful dishonor and Guaranty Federal's action concerns conspiracy to defraud.[11] Therefore, we hold that the trial court did not abuse its discretion in severing Horseshoe's action on the check from Guaranty Federal's third party action.[12]

11. Although Guaranty Federal alleged that it has a "potential claim" against Horseshoe for conspiracy based upon Horseshoe's alleged complicity in the third party defendant's scheme to defraud, Guaranty Federal failed to assert a claim against Horseshoe for conspiracy to defraud by counterclaim or otherwise.

12. Under appropriate circumstances, a defendant such as Guaranty Federal may join a cus-

tomer or claimant as an involuntary party to assert its available defenses to payment of a teller's check. *See* Tex.Bus. & Com.Code Ann. § 3.306 comment 5 (Vernon 1968) which states in pertinent part: "Nothing here stated is intended to prevent any interpleader, deposit in court or other available procedure under which the defendant may bring the claimant into court or be discharged without himself litigating the

For the reasons explained herein, we affirm the judgment of the First Court of Appeals in *Intercontinental Consolidated Companies.* We also affirm that portion of the judgment of the Fifth Court of Appeals in *Guaranty Federal Savings & Loan Association* concerning the severance of Horseshoe's action on the check against Guaranty Federal from Guaranty Federal's third party action, and otherwise reverse the judgment and remand the cause to the trial court.

Concurring and dissenting opinion by MAUZY, J., joined by RAY and GONZALEZ, JJ.

MAUZY, Justice, concurring and dissenting.

I concur with the majority's disposition of *University Savings,* but I respectfully dissent from the decision in *Guaranty Federal.* In my view, the record in *Guaranty Federal* shows plainly that the "official check" involved there was an executed sale of credit and was not subject to rescission and countermand under the facts presented. I agree with the court of appeals that

> it blinks reality for the courts not to treat ... an "official check" [sold for a two-dollar fee] of a savings and loan association in Texas as the equivalent of cash. Too much of the personal and commercial business of this State is transacted with such checks with the expectation that they do represent cash. Certainly Guaranty considered that this "official check" was the equivalent of a cashier's check and thus was delivered as the equivalent of cash. In this connection, the record contains various evidence indicating that Guaranty treated its "official check" as analogous to a cashier's check. [One of Guaranty's vice presidents, David] Liner repeatedly referred to the "official check" as a cashier's check and a bank money order. On deposition, Liner testified as follows:
>
> > [Horseshoe's Attorney]: Would you tell the Court and the jury just what

the purpose is for an official check application?
>
> > [Liner]: It's where the person comes in and gives us cash or good funds to issue a check to someone in their behalf. We use these as official checks or money orders instead of issuing a regular check.

Further, the record contains a computer printout regarding the $900,000.00 check which specifically refers to the check as a "money order writer." The record also contains a copy of the debit/credit transfer form used by Guaranty, which bears the notation, "Stop pmt on cashiers check." Harold Ruyle, Guaranty's vice president in charge of security and regulations compliance, testified that the official check "could probably be categorized as a cashier's check." Ruyle referred to the check as a cashier's check when asked whether he had discussed this particular check with anyone.

748 S.W.2d 525–526.

Again, it must be emphasized that the record reflects that Guaranty charged Parmet a two-dollar fee for issuance of its "official check", just as any bank would charge for the issuance of a cashier's check. *See* J. Reitman, et al., *Banking Law* § 133.10 (1988). Plainly, both Parmet and Horseshoe had sufficient reason to rely on the savings and loan's check being the equivalent of cash. Accordingly, I dissent. I would affirm the Court of Appeals in *Guaranty Federal.*

RAY and GONZALEZ, JJ., join in this concurring and dissenting opinion.

---

claim as a defense." *See generally* Tex.Bus. & Com.Code Ann. § 3.803 (Vernon 1968). However, the record before this court does not indi-

cate that either Parmet or his alleged co-conspirators had any available defenses to payment of the teller's checks.